43FSREERS

1  SOUTHERN DISTRICT OF NEW YORK
   ------------------------------x
2
   REERS, et al.,
3
                    Plaintiffs,
4
            v.                         03 Civ. 5360
5
   DEUTSCHE BAHN AG, et al.,
6
                    Defendants.
7
   ------------------------------x
8
                                     March 15, 2004
9                                    10:45 a.m.

10  Before:

11              HON. MIRIAM GOLDMAN CEDARBAUM,

12                                     District Judge

13                      APPEARANCES

14  KREINDLER & KREINDLER LLP
         Attorneys for Plaintiffs
15  BY:  JAMES KREINDLER
         ANDREW J. MALONEY, III
16       VINCENT I. PARRETT

17       - and -

18  PATTON BOGGS LLP
    BY:  READ McCAFFREY
19       CHRISTOPHER W. HELLMICH

20  WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
         Attorneys for Defendants
21  BY:  THOMAS R. CHERRY
         THOMAS A. LEGHORN
22       RICHARD E. LERNER
         BRETT SCHER
23

24

25

43FSREERS

1           (Case called)

2           THE COURT:  Good morning, please be seated.

3           This is a motion to dismiss based on several grounds

4    actually:  Forum non conveniens, lack of personal

5    jurisdiction -- and those are probably the major grounds -- and

6    failure to state a claim is also asserted.

7           Now, I also have some applications for admission pro

8    hac vice.

9           Who is here to be admitted pro hac vice?

10          MR. McCAFFREY:  Read McCaffrey of Patton Boggs from

11   Washington, D.C.

12          MR. HELLMICH:  Christopher Hellmich also from Patton

13   Boggs, Washington, D.C.

14          THE COURT::  All right.  I take it that you have

15   familiarized yourselves with the rules of this district, the

16   local rules?

17          MR. McCAFFREY:  We have been privileged to be here

18   before.

19          THE COURT:  Very well.  That is a different matter.

20          MR. McCAFFREY:  Yes, your Honor, it certainly is.

21          THE COURT:  I will grant your applications.

22          MR. McCAFFREY:  Thank you.

23          THE COURT::  I will sign them and we will file them in

24   the clerk's office.

25          Now, who is going to explain to me how I have personal

43FSREERS

1    jurisdiction of a German railroad company that runs no

2    railroads in the United States and, which I take it, own the

3    railroad car on which this terrible accident occurred; that is,

4    nobody bought a ticket on a German railroad or even on a French

5    railroad in New York.

6            Whatever happened here happened in France and the

7    defendants, the two principal defendants that are being sued

8    here, which are Deutsche Bahn AG and Stennis Corporation, is

9    that right?

10           MR. KREINDLER:  Yes, your Honor.

11           THE COURT:  All right.

12           The argument, as I understand it, is that Deutsche

13   Bahn AG is the half owner of another company which has a

14   subsidiary which owns a company in New York.

15           Now, how does that give me personal jurisdiction over

16   the very remote Deutsche Bahn AG?

17           MR. KREINDLER:  Yes, your Honor.

18           Let me start with the test of doing business under

19   301.  A foreign company is doing business in New York if it is

20   acting in New York through either a mere department or an

21   agent.  In this case the Amore/Myers family members could have

22   purchased their tickets in New York.

23           THE COURT:  But, in fact, they did not.

24           MR. KREINDLER:  In fact, they did not.

25           THE COURT:  Whom could they have purchased those

43FSREERS

1    tickets from?

2            MR. KREINDLER:  From Deutsche Bahn.  But --

3            THE COURT:  No, forget that.

4        Is there a subsidiary of Deutsche Bahn AG in New York

5    that would have sold tickets?

6            MR. KREINDLER:  Yes.

7            THE COURT:  Or is it an american airlines that would

8    have sold them tickets?

9            MR. KREINDLER:  Your Honor, you --

10           THE COURT:  Why don't you tell me what company in New

11   York would have sold them or holds itself out as selling

12   tickets on a French railroad.

13           MR. KREINDLER:  First of all, your Honor, let me just

14   say when it's a French railroad, the accident was in France but

15   it is a German French operation.

16           THE COURT:  Wait just a moment.  The railroad company

17   from whom the ticket was bought was a French company.  As I

18   understand it, and maybe I misunderstand the facts, the

19   railroad car on which the accident occurred was owned by a

20   German company, isn't that right?

21           MR. KREINDLER:  Yes, your Honor there are two main

22   groups of defendants here, the Deutsche Bahn defendants and the

23   Accor defendants.

24           THE COURT:  I understand, but I would like to focus

25   first on the German defendants.

43FSREERS

1              MR. KREINDLER:  Okay.

2              THE COURT:  First, tell me what Deutsche Bahn AG does.

3    What is its business?

4              MR. KREINDLER:  Deutsche Bahn AG is in the business of

5    operating large rail systems in Germany and other countries.

6              THE COURT:  Does it operate a rail system in France?

7              Try to answer my questions first, then I will give you

8    a full opportunity to persuade me that they are the wrong

9    questions.

10             MR. KREINDLER:  It owns the cars and has treaty

11   obligations with other French defendants.

12             THE COURT:  That is not its business.  I want to know

13   what its business is.

14             Does it own a railroad in Germany?

15             MR. KREINDLER:  Yes.

16             THE COURT:  Does it operate a railroad in Germany?

17             MR. KREINDLER:  Yes.

18             THE COURT:  Does it operate a railroad in France?

19             MR. KREINDLER:  It operates rail cars in France.

20             THE COURT:  When you say operate, what do you mean?

21   It doesn't supply rail cars but rather operates them?

22             MR. KREINDLER:  It supplies --

23             THE COURT:  It supplies them.  Is it a manufacturer of

24   rail cars?

25             MR. KREINDLER:  No.

43FSREERS

1        THE COURT:  Who manufactured this rail car?  That is,

2   I am trying to understand how you get even to Deutsche Bahn AG.

3        MR. KREINDLER:  Let me answer that question, how do

4   you get to Deutsche Bahn AG.  We identify the negligent acts of

5   different people that caused this disaster.  Number one of

6   course is the conductor who was employed by one of the Deutsche

7   Bahn subsidiaries.

8        THE COURT:  And which company was that?

9        MR. KREINDLER:  Deutsche Bahn R&T.

10        THE COURT:  That company employed stewards on the

11   French railroad, is that right?  What does that company do?

12   What is its business?

13        MR. KREINDLER:  The operation supplied the employees

14   to the German rail cars.  There were French employees on this

15   train and there were German employees on this train.

16        THE COURT:  And they were employed by different

17   employers?

18        MR. KREINDLER:  Yes.

19        THE COURT:  All right.  So there is a company that

20   supplies rail cars and employees and what company is that?

21        MR. KREINDLER:  That is the Deutsche Bahn company.

22        THE COURT:  That is not Deutsche Bahn AG.

23        MR. KREINDLER:  No, it's R&T.

24        THE COURT:  Who owns R&T?

25        MR. KREINDLER:  Deutsche Bahn.

43FSREERS

1          THE COURT:  100 percent?

2          MR. KREINDLER:  I think so, yes, 100 percent.

3          THE COURT:  And does R&T do any business in the United

4   States?

5          Do they maintain any railroad cars or have employees

6   working on American railroads?

7          MR. KREINDLER:  The answer is they do business in the

8   United States --

9          THE COURT:  But not their main business.

10         MR. KREINDLER:  You do not find R&T conductors in the

11  United States.

12         THE COURT:  What is the business they do in the United

13  States, R&T?

14         MR. KREINDLER:  There are a number of subsidiary

15  companies --

16         THE COURT:  But that is a different matter.  First I

17  want to know what business R&T does.

18         MR. KREINDLER:  It solicits business.

19         THE COURT:  What business does it solicit?

20         MR. KREINDLER:  People like these victims to travel on

21  Deutsche Bahn.  Approximately 10 percent of the fare-paying

22  passengers on Deutsche Bahn come from the United States.

23         THE COURT:  But most of them buy their tickets abroad.

24         MR. KREINDLER:  No, I don't know that is true.

25         THE COURT:  Who sells them the tickets?

43FSREERS

1      MR. KREINDLER:  You can purchase the tickets.  Their

2  agent is right here in White Plains.

3      THE COURT:  Who is the agent?

4      MR. KREINDLER:  DER, destination Europe resources.

5      THE COURT:  But doesn't that operation represent many

6  European transportation companies?  It's certainly not their

7  exclusive agent.

8      MR. KREINDLER:  It is an agent for other companies.

9      THE COURT:  It's a general agent.  That is not the

10  kind of agency that makes a foreign company present in the

11  United States.

12      MR. KREINDLER:  I think it is exactly the type of

13  agency.

14      THE COURT:  Can you cite me a single case in New York

15  in which a general agency that handles tickets for a host of

16  unrelated European companies brings one of those European

17  companies to New York for purposes of jurisdiction?

18      MR. KREINDLER:  No.  There is no case that we have

19  found squarely on point.

20      THE COURT:  Well, the cases not only are not squarely

21  on point, they go the other way.  They say that if you are not

22  controlled by a foreign entity, you cannot be treated as their

23  agent in this country.

24      MR. KREINDLER:  But that is the point, they are

25  controlled.

43FSREERS

1                THE COURT:  DER is owned by whom?

2                MR. KREINDLER:  Deutsche Bahn -- I am sorry, by REG.

3                THE COURT:  What is REG?

4                MR. KREINDLER:  I will turn it over to Mr. Hellmich on

5      REG.

6                THE COURT:  All right.

7                MR. HELLMICH:  REG, I am not certain who owns REG --

8                THE COURT:  But you know it's not owned by Deutsche

9      Bahn.

10                MR. HELLMICH:  Correct.

11                THE COURT:  So clearly it's not owned by Deutsche

12      Bahn, not controlled by Deutsche Bahn.  It has many customers

13      other than Deutsche Bahn in the United States.

14                MR. HELLMICH:  And I would agree if that is all we are

15      hanging our hat on today, your Honor, we would not stand a very

16      good chance.

17                THE COURT:  DER doesn't help you.

18                MR. HELLMICH:  It does help us.

19                THE COURT:  How?

20                MR. HELLMICH:  Because it is a contract and it's a

21      contact that Deutsche Bahn AG and Deutsche Bahn R&T have in New

22      York.  It's not the sole contact and it's not the sole basis

23      for agency and I would argue there is a much better analysis

24      for the agency analysis if we want to talk about Deutsche Bahn.

25      And that is the Stennis Corporation.  I think somebody misspoke

43FSREERS

1    earlier, there are two main defendants.

2              MR. KREINDLER:  Me.

3              MR. HELLMICH:  Deutsche Bahn AG and Accor Corporation.

4              THE COURT:  I misspoke.  I studied your papers but I

5    forgot the names.

6              MR. HELLMICH:  You hit on the right analysis.

7    Deutsche Bahn AG owns 100 percent of Stennis Corporation.

8    Stennis Corporation is based here in New York.

9              THE COURT:  What do you mean is based in New York?

10             MR. HELLMICH:  Well, its headquarters is in New York.

11   Its offices are in New York.  They report --

12             THE COURT:  This is a company incorporated in the

13   United States?

14             MR. HELLMICH:  Oh, yes, ma'am, in New York.

15             MR. KREINDLER:  In Tarrytown, your Honor.

16             THE COURT:  All right.

17             First tell me who owns Stennis, the New York Stennis.

18             MR. HELLMICH:  We argued in our declaration that

19   Deutsche Bahn AG owns 100 percent of it directly.  In fairness

20   the defendants say that there is an intermediary company or two

21   between the ultimate parent Deutsche Bahn AG and Stennis

22   Corporation, but Palmieri --

23             THE COURT:  What is the business of Stennis

24   Corporation?

25             MR. HELLMICH:  It is to do Deutsche Bahn's business.

43FSREERS

1           THE COURT:  What is that business?  Deutsche Bahn

2    doesn't sell railroad cars in the United States, does it?

3           MR. HELLMICH:  No, they don't, but what they do is

4    Deutsche Bahn has two main lines of business.  One is selling

5    passenger travel in Germany and throughout Europe.  The other

6    is cargo.  Cargo and transport of significant commercial

7    commodities is a major business of Deutsche Bahn.

8           THE COURT:  And I understand that is Stennis' business

9    in the United States.  They sell what in the admiralty world

10   they call NCOO.  They are a broker for cargo transportation.

11          MR. HELLMICH:  As Deutsche Bahn says in its annual

12   report that is a core business of Deutsche Bahn.  So they are

13   doing Deutsche Bahn's business in New York.

14          THE COURT:  Right, but they are not doing this

15   business.

16          MR. HELLMICH:  No, but none of the tests require that.

17          THE COURT:  What makes them an agent of Deutsche Bahn?

18   Does Deutsche Bahn sell any cargo transportation in the United

19   States?

20          MR. HELLMICH:  Yes, they do, your Honor, through

21   Stennis.

22          THE COURT:  What is that?  If I want to arrange to

23   have my cargo transported somewhere in the United States, do I

24   make any contact with Deutsche Bahn?

25          MR. HELLMICH:  The way Deutsche Bahn is organized is

43FSREERS

1   if you had cargo anywhere in the world you could move your

2   cargo on their seamless web of cargo transportation from Hong

3   Kong to Los Angeles, from Frankfurt to Miami, you name it, that

4   is what they want to do, and that is what they are doing

5   through Stennis, and so the answer is yes.

6        The reason they are an agent, and the tests don't

7   require Dorfman -- In Re Cap Run do not require the agency

8   analysis to say does the agency relationship rely specifically

9   or is it analogous specifically to the facts of the case.  In

10   other words, there is no requirement for Deutsche Bahn's agent

11   to be selling tickets in New York for that to be considered an

12   agent.

13        THE COURT:  I understand, but the agent, in order to

14   be an agent for a remote corporate parent, or here a

15   grandparent, the so-called agent is an agent only if it does

16   business that the foreign company would have to otherwise come

17   here to do itself.

18        MR. HELLMICH:  Absolutely.  And the first point to

19   recognize, I think, your Honor, is that ownership is not

20   required for the agency analysis.  It is in fact presumed if

21   the parent owns 100 percent or controls the New York entity

22   that there is an agency relationship.  So we start with the

23   presumption, but to move --

24        THE COURT:  I would like you to cite me a single case

25   that holds the mere fact --

43FSREERS

1          MR. HELLMICH:  Frummer.

2          THE COURT:  Frummer doesn't hold that at all.  Frummer

3    was a hotel chain which had an agent or a subsidiary in New

4    York that took the reservations directly related to its

5    business.  There was no presumption that because it was a

6    subsidiary it had to be an agent.

7          MR. HELLMICH:  It's a two-part test.  The point that I

8    am making first, your Honor, is ownership is not required but

9    if ownership --

10          THE COURT:  Of course not, but in order to be either

11    an agent or a department you have to be controlled, isn't that

12    right?

13          MR. HELLMICH:  I agree, of course.  And there is no

14    doubt, based on the declaration that we prepared, that Deutsche

15    Bahn controls Stennis.

16          THE COURT:  I didn't understand that from your

17    declaration; that is, you give me so little information about

18    what Stennis does and what Deutsche Bahn does and who owns

19    what, I thought that there was some break in that chain.

20          Which is the company that is no longer in business?

21          MR. HELLMICH:  I am not sure I know what you are

22    referring to, your Honor.  As far as I know they are all still

23    in business.  Deutsche Bahn is in the process of selling and

24    breaking up part of Stennis here in the United States and

25    selling it to an American entity.  And so they are still

43FSREERS

1    doing -- that is one of the contacts that we allege in New

2    York.

3            But to get back to your agency question, your Honor,

4    there is no doubt that Deutsche Bahn owns Stennis Corporation

5    here in Tarrytown, New York.  And there is no doubt that the $2

6    billion in revenue that Stennis Corporation generates every

7    year, which is 10 percent of Deutsche Bahn AG's world-wide

8    revenue, is a significant business that they would be doing

9    themselves if they did not have Stennis Corporation here in

10   existence.  It's 10 percent of their revenue.  By all accounts

11   $2 billion is significant.

12           THE COURT:  But the company that employed or that had

13   some connection with the French train has what relation to

14   either Stennis in New York or Deutsche Bahn?

15           MR. HELLMICH:  They share a common parent, your Honor.

16   R&T is wholly-owned by Deutsche Bahn, as is Stennis

17   Corporation.

18           THE COURT:  I understand, but that doesn't mean R&T

19   controls Stennis, does it?

20           MR. HELLMICH:  No, and I would suggest --

21           THE COURT:  Why isn't that a serious problem for you?

22           MR. HELLMICH:  Because if you look at cases like

23   Dorfman -- Dorfman I think is the quintessential case for the

24   court to focus on.  In Dorfman a woman in a Hungary hotel owned

25   by Marriott was injured in an Otis Elevator.  Otis Elevator, a

43FSREERS

1   Connecticut company, was not doing business or was found to be

2   doing business under 301 in New York and so was sued in New

3   York, as was Otis Hungary.  That is not the name of the

4   company, I am just using that for ease.

5          The court found general jurisdiction over Otis

6   Elevator, the Connecticut company, and through the agency -- it

7   doesn't really matter what they used.  They can use a

8   systematic and continuous contact, they can use mere

9   department, or they could find agency.

10         THE COURT:  That was a product liability case in which

11  the charge was that Otis Elevator manufactured a defective

12  elevator, isn't that right?

13         MR. HELLMICH:  No, your Honor.  The issue there was

14  the service of the elevator in Hungary, was it serviced

15  properly and it malfunctioned while it was over there.  So I

16  don't believe it was a design manufacturing-type defect

17  scenario.  But the court first found general jurisdiction over

18  the Connecticut company, Otis Elevator, and then it went and it

19  did the same analysis.  It says, does Otis Hungary do any

20  business in New York?  No, so they don't mean the systematic

21  and continuous contact.  Are they though a mere department --

22         THE COURT:  What you are telling me is that American

23  Otis set up agencies around the world to do exactly what it

24  does here but that is not what you are suing for.  You are not

25  suing for anything that the German grandparent does in Germany.

43FSREERS

1    That is, the defendant that you are really seeking is the

2    company that employed the employee, the steward on the train on

3    which this accident took place.  That steward was not employed

4    by the German company.  It was employed by a subsidiary of the

5    German company, isn't that right?

6            MR. KREINDLER:  Yes, your Honor, but --

7            THE COURT:  So it's not the German company that did

8    anything.  You have to be seeking personal jurisdiction over a

9    company that did something in this accident.

10           MR. HELLMICH:  R&T is the German company.

11           THE COURT:  That is whom you are suing?

12           MR. HELLMICH:  Yes, we are suing Deutsche Bahn R&T,

13   the German company.

14           THE COURT:  Are you claiming that Deutsche Bahn USA or

15   whatever, Stennis, is a wholly-owned subsidiary of that

16   company?

17           MR. HELLMICH:  Of the common parent Deutsche Bahn.

18           THE COURT:  Well, but that is a different matter,

19   isn't it?  What do you mean common parent?  Does the company

20   that you are suing own any entity in the United States?

21           MR. HELLMICH:  No.

22           THE COURT:  Then how can any company in the United

23   States be its agent?

24           MR. HELLMICH:  Because there are three separate tests

25   as Dorfman laid out.  In Dorfman they found general

43FSREERS

1  jurisdiction over the Otis Hungary company that does no

2  business in the United States and certainly does not own its

3  parent.  And the reason --

4      THE COURT:  But that was a parent-subsidiary

5  relationship.

6      MR. HELLMICH:  Which is what we have here.

7      THE COURT:  No, you are not.  You are suing a company,

8  the employer of Volker.

9      MR. HELLMICH:  Yes, DBRT.

10     THE COURT:  And you are claiming that Stennis in the

11 United States is its wholly-owned subsidiary, which it isn't.

12     MR. HELLMICH:  We are not claiming that.

13     THE COURT:  I understand, but you are claiming that

14 Stennis is its agent.  How is that?

15     MR. HELLMICH:  We are not claiming that either, your

16 Honor.

17     THE COURT:  How are you getting personal jurisdiction

18 over that company?

19     MR. HELLMICH:  Okay, to go back to Dorfman, what

20 Dorfman says is first you determine is Deutsche Bahn AG, who we

21 are suing, doing business in America, in New York?  Do they

22 have 301 continuous contacts in New York, and that is the first

23 question.

24     THE COURT:  Please, please, you are citing a case --

25 facts matter, not just general statements.  You are citing a

43FSREERS

1    case in which the Hungarian company was a wholly owned

2    subsidiary of an American company.  You are not citing a case

3    in which a Hungarian company had no agent in the United States.

4              MR. KREINDLER:  Your Honor, if I can interject, at

5    this point our allegations have to be assumed to be true at

6    this point.

7              THE COURT:  That is not correct.  You have to make a

8    prima facie showing.  Certainly this is a matter of facts; this

9    is not a matter of assertions.

10             MR. KREINDLER:  Here are the facts I wish to address:

11   We have alleged that R&T is a mere department of Deutsche Bahn,

12   the parent or the grandparent.

13             THE COURT:  But what is the ground for that?  That is,

14   when a motion to dismiss for lack of personal jurisdiction is

15   made, the plaintiff is not required to make more than a prima

16   facie showing but you have to make a prima facie showing.  You

17   cannot rely only on the complaint when matter outside the

18   complaint is offered.

19             MR. KREINDLER:  The point we wish to make is because,

20   and I think we have made a prima facie showing that --

21             THE COURT:  So far you haven't.

22             MR. KREINDLER:  Let me try, your Honor.  That R&T is a

23   mere department --

24             THE COURT:  What is the basis for that allegation?

25             MR. KREINDLER:  Because Deutsche Bahn AG owns R&T

43FSREERS

1    completely, appoints the officers, selects its insurance.

2            THE COURT:  Is that correct?

3            MR. HELLMICH:  Yes, and I can point to the

4    declaration.

5            THE COURT:  Never mind the declaration, I want to know

6    how you know that.  What is that based on?

7            MR. KREINDLER:  From the inquiry we have been able to

8    do from public information, from their own statements.

9            THE COURT:  So this French company, or German company

10   in France that employed Volker, is a wholly-owned subsidiary of

11   a German company and so what you are trying to do is you are

12   trying to sue the German company in reverse; that is, the fact

13   that a French company is a wholly-owned subsidiary of a German

14   company doesn't give American jurisdiction.  Our Otis case was

15   an American company that owned companies abroad, isn't that

16   right?  You need to show how that possibly brings either of

17   them to the United States.

18           MR. HELLMICH:  You are exactly correct, your Honor.

19   And I think what the first premise of Otis says is that Otis

20   was not a New York company.

21           THE COURT:  It's an American company.

22           MR. HELLMICH:  Well --

23           MR. KREINDLER:  Your Honor, let me get back to these

24   facts.  I think because Deutsche Bahn AG owns DBRT, appoints

25   the top directors, the people on the board --

43FSREERS

1    THE COURT:  That is, there is no intermediary between

2    those two.

3        MR. KREINDLER:  Correct, your Honor.

4        THE COURT:  Is that correct?

5        MR. KREINDLER:  As far as we know.

6        THE COURT:  I don't think so.  I don't think you are

7    right.

8        MR. HELLMICH:  I believe there are intermediary

9    Deutsche Bahn --

10       THE COURT:  Haven't the defendants come forward and

11   shown there are intermediaries?  You can't ignore that.

12       MR. HELLMICH:  Of course not, but the court is

13   actually saying in Palmieri and ESI, they both say common

14   parent or common ownership is all that is sufficient.  That

15   there are oftentimes, Palmieri is a classic example where the

16   ultimate parent was Sony Corporation but the defendant that

17   they were suing were four or five layers down.  Ultimately --

18       THE COURT:  But you are suing the parent.

19       MR. HELLMICH:  And the subsidiary.

20       THE COURT:  Well, I understand.  Don't you have to

21   make your choice?  Why are you suing all of them?

22       MR. HELLMICH:  Because they are both liable.

23       THE COURT:  You are looking to the parent to provide

24   jurisdiction over the subsidiary, the French subsidiary.  And

25   you are looking for the subsidiary to provide jurisdiction over

43FSREERS

1    the parent and neither of them is an American company.

2              MR. HELLMICH:  That is not quite the right analysis,

3    your Honor.  If I can go back to Dorfman, Dorfman says that

4    when a foreign company, foreign outside of New York, foreign

5    outside of -- well, let's go to In Re Skycap Run.  In In Re

6    Skycap Run they sued Siemens AG and Siemens Austria.  Siemens

7    AG has Siemens Corporation here in New York.  First in In Re

8    Skycap they got 301 general jurisdiction over Siemens AG and

9    the court went on and said is there mere department or agency

10   analysis that would allow us to have jurisdiction over Siemens

11   Austria?  And the court performed that analysis.  Now, it

12   didn't find it in In Re Skycap but it did in Dorfman.  So the

13   analysis, first, is we have sued Deutsche Bahn AG and the

14   question is are they doing business in New York and the

15   declaration goes through and lays out specifically -- it's

16   broken into three parts.  The first is --

17             THE COURT:  Let me stop you for just a moment.  You

18   are saying you can assert a claim that you cannot sustain

19   against one company in order to get jurisdiction over a company

20   that you might have a ground for suing; that is, what did the

21   German company that the parent or grandparent or uncle do here

22   that they are liable or that that company is liable for it?

23             MR. HELLMICH:  Among other things, they are

24   responsible for the training that goes on at DBR&T.  They run

25   what is called the Deutsche Bahn Academy.  And they train and

43FSREERS

1    they are responsible for training all DBR employees.  As part

2    of the control to show the control that DBAG has over all the

3    subsidiaries, they do all the recruiting and hiring.  They do

4    all the employee retention.  They do collective bargaining on

5    behalf of DBR&T.  And so they also train those employees, and

6    that is one of the causes of action we have against DBAG, is

7    that they failed to train --

8            THE COURT:  Do you have any other cause of action?

9            That is your only claim against them, isn't it?

10            MR. KREINDLER:   No, your Honor, we have the training

11    claim.  The decisions on how to equip and operate the car were

12    wrong and fatal.  There is one fire extinguisher but it's at

13    the opposite side of the car from the kitchen where the fire

14    occurred.

15            THE COURT:  So you are suing the German company for

16    product liability?

17            MR. KREINDLER:  We are suing the German company for

18    negligently selecting safety equipment and the placement of the

19    safety equipment.  If I can be specific so we are clear, it

20    doesn't make sense to have a fire extinguisher at the opposite

21    end of the car from the place where fires are most likely to

22    occur.  That is obvious.  It doesn't make sense to have a

23    hammer to break the glass so passengers can escape, to have

24    that hammer hidden in the bathroom.  It doesn't make sense to

25    have a little T-bar hammer that isn't sufficient to break the

43FSREERS

1   glass.

2           THE COURT:  So you are suing the German grandparent

3   for what I call product liability, for faulty design.

4           They manufactured the car, is that right?

5           MR. KREINDLER:  They didn't manufacture the car.

6           THE COURT:  What did they do?

7           MR. KREINDLER:  They determined how and where safety

8   equipment would be placed and what safety equipment there would

9   be.  They decided that the windows should be coated with this

10  thick plastic substance that couldn't be broken.  So they

11  decided what safety equipment to put on the train or decided

12  what safety equipment not to put on the train and how to put it

13  on the train.

14          THE COURT:  Let me shift now to the other grandparent

15  that you want to sue, Accor.

16          MR. KREINDLER:  If I can say one more word about

17  Deutsche Bahn because I feel that I have failed to communicate

18  what we are --

19          THE COURT:  You are doing the best with what you have

20  got.

21          MR. KREINDLER:  Let me say this:  The theory behind

22  the cases holding that an entity can be treated as an entity

23  when its subsidiaries are mere departments, the theory behind

24  that, in my understanding, is you can't insulate a company by

25  artificial distinctions.  When a parent owns a subsidiary,

43FSREERS

1    appoints the people on the board, decides how to insure them,

2    what their risk management should be, controls their finances,

3    arranges for their banking, decides what important decisions

4    would be made, effectively the parent and that department are

5    one.

6              What we are trying --

7              THE COURT:  I understand all of that but the big

8    strain is getting a department into the United States.

9              We all understand that is a serious problem, but let's

10   move to Accor.

11             MR. KREINDLER:  All right.

12             I am glad to move to Accor but permit me one sentence,

13   maybe a long sentence on this, your Honor.  If Deutsche Bahn

14   instead of creating these levels of subsidiaries kept it as one

15   big company and 10 percent of their revenue comes from their

16   office in Tarrytown that is doing cargo, and 10 percent comes

17   from American passengers at Stennis, all the Deutsche Bahn

18   companies were one company, we wouldn't be here.  There would

19   be no issue.  I mean, if this was General Motors, period, with

20   plants around the world, there would be no issue.  And there

21   would be no issue if GM's car manufactured in Japan killed

22   Americans.

23             The point we want to make on mere departments is when

24   a company creates these artificial layers of companies but

25   fully and completely controls them all, we have jurisdiction

43FSREERS

1    over that company even if only one corner of that company is in

2    the United States and if the negligence is done by that

3    company's employees in Germany or Timbuktu.  And that is why

4    our case really hinges upon these various companies being in

5    fact mere departments completely controlled.

6         THE COURT:  I understand that is what you would like

7    to show, what you argue.  I understand that.  But New York does

8    not ignore corporate entities; that is, piercing the corporate

9    veil in New York is a difficult matter.  That is not true

10   everywhere, but it is true under the law of New York.  When you

11   deal with a corporation you are on notice that you are dealing

12   with a corporation and not with some other company.

13        MR. HELLMICH:  But I would suggest, your Honor, we are

14   not trying to pierce the corporate veil here.  The

15   jurisdictional --

16        THE COURT:  What else are you doing?

17        MR. HELLMICH:  All we are looking --

18        THE COURT:  When you call something a mere department

19   you are piercing the corporate veil.

20        MR. HELLMICH:  Respectfully, your Honor, I would

21   suggest we are analyzing jurisdictional contacts which are

22   separate from a liability analysis.  It's completely different.

23   We are not trying to sue only Deutsche Bahn for the wrongdoing

24   that DBR&T did.  What we are --

25        THE COURT:  You want to sue both of them, I

43FSREERS

1   understand, the more pockets the better.

2           MR. HELLMICH:  Of course.  But the first question,

3   your Honor, is if you breakdown all the defendants is DBAG, can

4   we sue DBAG, forget about DBR&T, can we sue DBAG, do they have

5   jurisdictional contacts here, which is the first question.  Do

6   they have a mere department or an agent in New York?  And if

7   the answer to that is yes, then you stop and you say, all

8   right, they are doing 301 business.

9           THE COURT:  I understand that.  The problem is getting

10  to that conclusion obviously.

11          MR. HELLMICH:  Right.  And that is why the declaration

12  is broken into three parts, the systematic and continuous

13  contacts for the first time, the mere department, and then then

14  the agency analysis.  And they are three separate tests.  We

15  think we have established enough systematic and continuous

16  contacts to say without Stennis Corporation here DBAG is

17  certainly doing direct business here systematically and

18  continuously.  You can buy train tickets in New York online

19  from DBAG right now.  You couldn't do that a few months ago.

20          THE COURT:  But buying online in itself is not a

21  connection with New York, as we know.  We are one world through

22  the Internet.

23          MR. HELLMICH:  I understand, and if we were hanging

24  our hat on that I wouldn't feel so comfortable.  But the three

25  separate tests, we have systematic and continuous contacts that

43FSREERS

1    we allege and those allegations do make a prima facie cas

2    But even if you are not convinced by that, the mere department

3    test, the fact that they have overlapping board of directors,

4    that they control the finances of Stennis Corporation, that

5    they control employment decisions, that they control

6    operational management decisions at Stennis Corporation makes,

7    and conclusively establishes by the allegations, a prima facie

8    case from your department of DBAG to Stennis.

9            THE COURT:  Why don't we move to Accor.

10           MR. KREINDLER:  Accor is a company through CIWLT that

11   did the maintenance, the negligent maintenance on the car.

12           THE COURT:  Which Accor are you talking about?

13           MR. KREINDLER:  SA.  Your Honor will remember when we

14   were here before we agreed to dismiss Accor NA.  We didn't

15   allege that Accor NA did anything wrong.  We did allege that

16   Accor NA's existence was relevant on the jurisdictional

17   argument.  That is why we dismissed NA.  Accor is a huge

18   company.  It owns a number of popular hotels, Sofitel, Days

19   Inn.

20           THE COURT:  You are talking about the Accor in this

21   country.  Accor North America?

22           MR. KREINDLER:  I am talking about the Accor SA.

23           THE COURT:  Societe Anomime.

24           What hotels does it own?

25           MR. KREINDLER:  Days Inn --

43FSREERS

1    THE COURT:  I thought those were all owned by Accor

2    North America.

3    MR. HELLMICH:  They were purchased by Accor SA

4    directly and moved into a subsidiary that is wholly-owned by

5    Accor SA.  There is an incredible spiderweb of connections but,

6    again, if you go to Palmieri and ESI, the sole ultimate

7    controlling parent is Accor SA.

8    THE COURT:  But that is a hotel business.

9    MR. HELLMICH:  That is correct.

10    THE COURT:  The question is what is the business of

11    Accor that you are suing for?

12    MR. HELLMICH:  It's also in the hospitality business.

13    It's hospitality for night trains moving through France.  And

14    CIWLT --

15    THE COURT:  I want to know how any American company

16    has anything to do with that business.

17    MR. HELLMICH:  Accor SA has two main lines of

18    business, one is hospitality and one is services which are not

19    related.  The hospitality division or group are broken up into

20    various hotels and hospitality businesses.  One of those

21    businesses is providing night attendants on board trains as

22    part of the whole hotel concept of hospitality.

23    THE COURT:  I thought it was a subsidiary of the other

24    defendant that supplied the employee.

25    MR. HELLMICH:  No, your Honor, Deutsche Bahn supplied

43FSREERS

1    the attendant on board Car 12, the Deutsche Bahn car that

2    caught fire.  Immediately behind that rail car was a French

3    rail car populated by attendants, by CIWLT, who are hired by

4    Accor and trained by Accor.  So those Accor CIWLT employees are

5    on board the adjoining rail car and it's their conduct, as well

6    as the fact that CIWLT was responsible for refurbishing the

7    rail cars many years preceding that we are suing WLT.

8              THE COURT:  But you are not surely suing individual

9    employees in the United States.

10             MR. HELLMICH:  No, certainly not.

11             THE COURT:  But you name Volker as a defendant.

12             MR. HELLMICH:  Yes, we did, your Honor.

13             MR. KREINDLER:  Your Honor, let me say a word about

14   Volker.  We acknowledge Volker is not individually doing

15   business here.  We expect him to be dismissed.  We have no

16   grounds for opposing that.  Obviously this is the man most

17   singularly responsible.

18             THE COURT:  That is right.  That is why you should go

19   where he is and sue there.

20             MR. KREINDLER:  Your Honor, there is no point to suing

21   Volker in Germany or here.  He doesn't have the individual

22   resources to pay the compensation that these families are owed.

23             THE COURT:  But then why do you name him, and I was

24   told by one of you that you were serving him under the

25   international treatise.

43FSREERS

1          MR. HELLMICH:  They all were served.

2          THE COURT:  So Volker has been served.

3          MR. HELLMICH:  He has been served, your Honor.  And

4   certainly, as Mr. Kreindler indicated --

5          MR. KREINDLER:  Well, the point is, your Honor, when

6   he individually moves to dismiss because he individually is not

7   doing business there, we can't object to that.

8          THE COURT:  All right.  Let me hear from your

9   adversaries for a minute.  I would like to switch anyway to

10  forum non conveniens.  I would like to hear from the other side

11  for a minute, the proponents of the motion.

12         MR. CHERRY:  My name is Tom Cherry and I am here on

13  behalf of the Deutsche Bahn defendant.  They all take the case

14  very seriously.

15         THE COURT:  I understand, and what I want to

16  understand first from you is exactly what is the relationship

17  of the various Deutsche Bahn defendants.

18         MR. CHERRY:  I draw the court's attention to the

19  affidavit of Frau Tsoucala, the Deutsche Bahn is the nationally

20  owned rail operator in Germany.

21         THE COURT:  So Deutsche Bahn is a foreign sovereign.

22         MR. CHERRY:  They are indeed.  They do have the two

23  subsidiaries.  I agree with my colleagues, the two

24  co-defendants are subsidiaries.  I disagree with their

25  allegation of the control, et cetera.  The Stennis Group was

43FSREERS

1    acquired some 28 days before this accident in toto, sometime in

2    late October, 25 October.

3         THE COURT:  So it's hard to find too much control.

4         MR. CHERRY:  It certainly would be.  One of the things

5    Mr. Hellmich left out from the affidavit is some of the annual

6    reports of 2002 in fact do indicate that the Stennis Group has

7    not been financially incorporated in the Deutsche Bahn's plan

8    going forward, et cetera.  There is no specific reference.

9         THE COURT:  Remind me who the Stennis Group are.

10        MR. CHERRY:  The Stennis Group was originally owned

11   by, again, a publicly owned entity that generated a lot of

12   electricity in Bruenheim, Germany.  Stennis AG is the company

13   that the Deutsche Bahn AG bought.  Stennis AG is based in

14   Bruenheim, Germany.  Stennis AG has subsidiaries throughout

15   Germany, throughout Europe.  They are in the business of

16   logistics.  They have a subsidiary called Stennis Holdings

17   which is based in New York, which again has another subsidiary

18   called Stennis Incorporated which is based in Tarrytown.

19        THE COURT:  And what is the business of that company?

20        MR. CHERRY:  They do transportation and logistics is

21   what is described as intermodal transportation, like your Honor

22   said, booking transportation, freight forwarding, et cetera.

23        THE COURT:  Do they do that outside of the United

24   States?

25        MR. CHERRY:  They do it in Europe and in the United

43FSREERS

1    States as well.

2            THE COURT:  That is, the New York company does it

3    abroad?

4            MR. CHERRY:  No, it does not.

5            THE COURT:  That is what I am trying to understand.

6    The New York company does it only in the United States.

7            MR. CHERRY:  That is correct.  There is some confusion

8    in Mr. Hellmich's affidavit where he does confuse Stennis AG

9    and Stennis, Inc. and I think --

10            THE COURT:  What is the difference in their business?

11            MR. CHERRY:  They are totally separate legal entities

12    operating in totally separate areas, jurisdictions, and they

13    basically have overlapping responsibilities as far as I

14    understand it in freight forwarding, basically transportation

15    of goods, the containers we see sometimes arranged to be

16    transported by various shipping modes.  That is how I

17    understand it.  It has nothing to do with train services in

18    that case.

19            THE COURT:  Well, does that matter for personal

20    jurisdiction?

21            MR. CHERRY:  Well, I think it does matter.  I don't

22    think there is a door you can knock on in the State of New York

23    that says Deutsche Bahn on it.  There isn't a place where you

24    can go in and buy a ticket here in the State of New York to

25    take a train ride and that has never been alleged in this

43FSREERS

1    particular action that the train ticket that was purchased

2    somehow in the State of New York led --

3          THE COURT:  I thought it was not purchased here.  It

4    was purchased in France.

5          MR. CHERRY:  In fact, it was purchased from SNCF, a

6    defendant not before the court who we couldn't implead.  They

7    are a foreign sovereignty and this court held they are a

8    foreign sovereignty, and that is a case that was well read law

9    and we have never been able to bring them in.

10          THE COURT:  But now tell me why this is an

11    inconvenient forum under the well-established law on the forum

12    non conveniens.

13          MR. CHERRY:  I think that the one issue that counsel

14    or claimants have cited is that their financial remedies would

15    not be adequate has clearly been held by the court not to be.

16          THE COURT:  That I understand.  You can forget that.

17          MR. CHERRY:  Why it would be impossible and difficult

18    for us is not a matter of a financial situation.  Our clients

19    would be prejudiced by having the blame for an enormously

20    tedious trial which we probably would have between 70 and 80

21    witnesses.  All of the investigation and documentation of the

22    French transportation authority is in French or German.  We

23    would never be able to compel those witnesses to come in.  If

24    we did, the court would have to apply French law in any case.

25          THE COURT:  Regardless of whether it's clear I think

43FSREERS

1    that is clear, that American law doesn't apply.

2            MR. CHERRY:  We would be stuck in a court in the

3    United States 4,000 miles away from where the accident actually

4    occurred and burdened with actually trying to prove a case in

5    another language in another court using completely different

6    standards and I don't think really the jury of this honorable

7    court has any interest whatsoever in terms of a public issue.

8    It's not something that anyone has ever any comprehension of.

9    The statistics that counsel draws that 10 percent of the

10   passengers in Germany are U.S. citizens, I have no idea where

11   that source is but I would imagine for one of every ten

12   individuals in a German train it would be American.  It seems

13   to me an exaggeration where we are.

14            I don't think that this court has a real public

15   interest in litigating a transportation accident in France.

16   Our clients stand ready, willing and able to honor their

17   responsibilities under French and/or German law as set out in

18   the COTEF theory.  This is not a situation where we are asking

19   the claimants to go back to some untoward country where there

20   is unfairness or some sort of a peculiarly primitive system

21   that they would seek the remedies in.  There is clearly an

22   established procedure, an established treaty which handles

23   this.  It addresses specifically personal injury in

24   transportation and I think the court has a great interest in

25   seeing that that treaty and the entire intent of it is carried

43FSREERS

1   out.

2           THE COURT:  Were other passengers that were injured in

3   this accident also American?

4           MR. CHERRY:  As far as we know there are five

5   Americans and they were represented by counsel present.  There

6   were 12 total individuals which perished some from Germany,

7   some from France, some I believe from Russia, and one or two

8   from Austria I believe.

9           THE COURT:  Is there any civil suit being pursued in

10  Europe by the families of any of those people?

11          MR. CHERRY:  Several of the claims have been settled

12  and are in the process of being settled through various interim

13  payments.  What there is is a criminal investigation which does

14  involve gathering testimony and on that criminal investigation

15  you as a claimant can file a suit which then piggybacks, if you

16  will, the criminal findings of the court and would eventually

17  resolve itself with some sort of payment for liability in

18  damages, and there are other claimants that have been made

19  whole -- the people that were not necessarily in the survivor

20  actions but injured parties and they have been paid out and

21  have been made whole according to French law.

22          THE COURT:  All right.  So certainly as to the nature

23  of the accident and what happened all of the witnesses are in

24  France.

25          MR. CHERRY:  And/or Germany, yes.  I know when counsel

1  was here last he suggested that there would be witnesses on

2  damages that would be appearing from Connecticut but I don't

3  think that is a relevant factor.  I think we are contesting

4  liability.  The court in this case is going to hear liability

5  and damages.  It's not going to be a situation where we are

6  going to be just rolling over, if you will.  There will be a

7  vigorous defense.  The one issue I think the court does need to

8  look at and also visualize also the contradictory arguments

9  that claimant's counsel is asking the court to follow is if

10  sovereign immunity applies in this case that would clearly mean

11  that the Deutsche Bahn AG is out of the case.  On the one hand

12  claimant's counsel is asking the court to find a spider's web

13  or mere departments between the two subsidiaries and, on the

14  other hand, that would sort of seem to be either one way or the

15  other.  He can't have it both ways.

16      THE COURT:  You are saying they would all become

17  foreign sovereigns at that rate.

18      MR. CHERRY:  If that was the argument if we followed

19  Mr. Hellmich logically they would enjoy sovereign immunities.

20      THE COURT:  But he is going to argue that the foreign

21  sovereign is doing business in the United States that way,

22  commercial activity, and therefore whether you treat them all

23  as a single sovereign or not they are not immune because of the

24  commercial activity.

25      MR. CHERRY:  One of the things clear in this case is

43FSREERS

1    there is no allegation in the complaint or any supporting

2    evidence to show this individual claim that the family members,

3    survivors, have made arises from any commercial activity in the

4    United States.  And that I think is the real exception in the

5    evidence.

6          THE COURT:  That is a serious point.  That is a very

7    serious point.

8          MR. CHERRY:  If there is anything the court needs

9    further otherwise I would retire.

10          THE COURT:  Is there anyone who wants to talk about

11   Accor?  I have heard only about Deutsche Bahn.

12          MR. LEGHORN:  Thomas Leghorn, and I represent Accor in

13   this matter, your Honor.

14          All the comments made by the court so far are equally

15   applicable with respect to Accor, but just turning to what the

16   allegations are, yes, Mr. Volker is not an employee of CIWLT

17   although it seemed in the opposition papers there was some

18   intimation that he could have been.  He is not.  Deutsche Bahn

19   has acknowledged that Mr. Volker is their employee.

20          The only allegations really in the complaint that work

21   their way up to the Accor chain is the refurbishment of this

22   particular sleeping car and that refurbishment was done by an

23   entity in the complaint, ISG-ESG which was a joint venture

24   between CIWLT and Deutsche Bahn.  That entity has gone into

25   liquidation and is out of existence.  So, therefore, in the

43FSREERS

1    complaint other than they are trying to attribute some act or

2    error on the part of ISG through CIWLT up to Accor, there is no

3    specific allegation against either CIWLT or Accor SA.  Accor SA

4    did nothing with respect to this train.  Accor SA other than

5    owning 99.48 percent of CIWLT, that is their only connection

6    here with this incident.

7             THE COURT:  But they had no investment in the

8    refurbishing company now out of business?

9             MR. LEGHORN:  No, it was CIWLT that had 50 percent

10   interest.  And they were the subsidiary corporation of Accor

11   SA.

12            THE COURT:  And what is the business of Accor in its

13   home?

14            MR. LEGHORN:  Accor's principal business is providing

15   of hotels.  They run the Sofitel, Novitel, Eabus chain

16   throughout Europe.  They own subsidiaries and as we saw from

17   the motion that we brought on previously for Accor North

18   America, there are a number of subsidiary corporations between

19   Accor SA and before you reach Accor North America.  There was

20   some discussion about U.S. hotels that were owned by Accor SA.

21   Now, Accor SA had at one time participated in a joint venture

22   with another entity in which it bought the Red River Inns but

23   those were immediately sold and are now in the Accor lodging

24   North America chain here in the United States with no

25   continuing involvement, and all with Accor SA and never been

43FSREERS

1   directly owned by Accor SA and have been purchased by a joint

2   venture of theirs and immediately transferred on.

3          The only other thing was Accor SA had purchased CIWLT

4   because the name implies traditional historical business was

5   sleeping cars but the Carson business has evolved into being

6   travel agencies.  So there was a symmetry in Europe with Accor

7   to have a travel agency as a part of its group business.  But

8   the Carson Travel in the United States is a separate

9   independent company not owned by Accor.

10          THE COURT:  I see.  And what is the Accor department

11   or agency in the United States, just the identity of it?

12          MR. LEGHORN:  Accor North America, Accor Lodging North

13   America was the one previously located in New York and then

14   several years ago moved to Texas.  But even that entity was

15   only owned 40 percent by Accor SA.

16          THE COURT:  Is there any wholly-owned subsidiary of

17   Accor in the United States?

18          MR. LEGHORN:  Of Accor SA, no, your Honor.

19          THE COURT:  All right.  Then I am puzzled as to how I

20   get personal jurisdiction over Accor SA.

21          MR. HELLMICH:  I respectfully disagree with the last

22   comment.  Accor SA owned 95 percent of a company called Accor

23   Leisure North America.  There are 20 companies that are owned

24   ultimately by Accor SA with only one or two intermediaries --

25          THE COURT:  What do you mean "owned ultimately?"

43FSREERS

1          MR. HELLMICH:  I have a chart I can show you, your

2     Honor.

3          THE COURT:  There seems to be a factual dispute

4     between you.

5          MR. HELLMICH:  Well, I don't believe there is any

6     dispute that at the time this lawsuit was filed Accor SA owned

7     directly, no intermediary, directly 90 to 95 percent of Accor

8     Leisure North America, a New York company.  Three months into

9     the lawsuit they shut the company down.  I don't know why.  We

10    know they owned it directly.  Red River Inn and all these other

11    companies are owned ultimately by Accor SA and what I mean by

12    that is there are one or more subsidiaries but there is no

13    third party out there.  It's not like Marriott Hotels owns 20

14    percent of one of these companies.  Everything always funnels

15    back up to Accor SA, which is the ESI case or Palmieri case

16    which says as long as it all goes back up to Sony Corporation

17    that is the ultimate parent.

18          THE COURT:  What do you mean by it does goes back?

19          MR. HELLMICH:  Ownership.

20          THE COURT:  This is something that you should be clear

21    about.  Does Accor SA own or not own through subsidiaries,

22    through wholly-owned subsidiaries, any company in the United

23    States?

24          MR. LEGHORN:  Your Honor, I was referring to the chart

25    for Accor North America and my associate reminds me there is

43FSREERS

1    another one, Accor Leisure.

2            THE COURT:  That is what they are relying on, Accor

3    Leisure.

4            MR. LEGHORN:  Accor Leisure is, once again, an

5    American company that had no involvement whatsoever in anything

6    to do with --

7            THE COURT:  But is it wholly-owned by Accor SA?

8            MR. LEGHORN:  It is a wholly-owned subsidary, yes,

9    your Honor.

10            THE COURT:  A direct subsidiary, not --

11            MR. LEGHORN:  A direct subsidiary of Accor SA.

12            THE COURT:  All right.  And that company, Accor

13    Leisure, is in the hotel business, is that right?

14            MR. LEGHORN:  Yes, your Honor, in the lodging

15    business, correct.

16            THE COURT:  Isn't that the hotel business?

17            MR. LEGHORN:  Right.

18            THE COURT:  And does that company have a New York

19    company?

20            MR. LEGHORN:  That company moved to Texas several

21    years ago, although by the time the corporate lawyers filed all

22    the withdrawals it was a few months after this lawsuit was

23    commenced that that was done but they moved to Texas.  They

24    used to be located on Underhill Road in Scarsdale and they

25    haven't been there in several years, your Honor.

43FSREERS

1      THE COURT:  All right.  Thank you all.  I reserve

2  decision.

3      MR. KREINDLER:  Your Honor, excuse me, can I say a

4  word on forum non conveniens, choice of law and sovereign

5  immunities?

6      THE COURT:  All right, but I have other people waiting

7  to be heard.  You have to do it quickly.  I read all your

8  papers.  I always hope that I have missed something that the

9  parties will bring to my attention when I have oral argument.

10      MR. KREINDLER:  There are three things I want to make

11  clear.  One, I think their forum non conveniens argument is

12  flawed because of the French inquiry which we are completely

13  certain will resolve liability questions.  As I said last time,

14  if this is a damages only case, as we are certain it will be in

15  several months, all the wrongful death damages witnesses are

16  here, none are in Europe.

17      On choice of law --

18      THE COURT:  How can that be?  How can that be?

19  Weren't there doctors who examined these people even in death?

20  Weren't there autopsies?

21      MR. KREINDLER:  I am making a distinction between

22  wrongful death and the estate claim for wrongful death.  The

23  heart of the case is the wrongful death claim either under

24  Connecticut law, New York or French law.

25      The point I want to make on French law, the defendants

43FSREERS

1    make the mistake if this court were to apply French law it

2    applies to the paltry damages you get in France.  That is not

3    Second Circuit law.  If this court applies French law it

4    applies to heads of damages recognized in France.  France has

5    the same elements of damages as New York law, economic loss,

6    loss of services, et cetera.  In addition to those elements,

7    there are more damages to compensate the family members for

8    their emotional pain and suffering.  If the issue is briefed we

9    will argue that Connecticut law should apply since they resided

10    in Connecticut and that is the state with the greatest

11    interest.  But I did want to note that French law is far

12    superior to New York law and the application --

13              THE COURT:  Then why are you fighting it?

14              MR. KREINDLER:  I am delighted to have the case here

15    in New York under French law and the families recovering more

16    in damages.  That will result in awards 50 times what they are

17    talking about.

18              The next point I wanted to make on sovereign immunity,

19    your Honor, is here we think that Deutsche Bahn has no

20    sovereign immunity for two reasons.  Number one, on waiver.  We

21    have argued, and you saw in our papers, that they waived

22    sovereign immunity by virtue of the CODA treaty.

23              THE COURT:  That is clearly a strain.

24              MR. KREINDLER:  Forget that, your Honor.

25              THE COURT:  Good.

43FSREERS

1          MR. KREINDLER:  They have waived sovereign immunity by

2     serving process on the families of the victims in the United

3     States, using process servers to serve them with documents

4     commanding them to appear in a proceeding in France, a

5     proceeding that the French court threw out as being

6     unwarranted.

7          Now, we think whether it's viewed as waiver --

8          THE COURT:  Oh, please, come on, it's not waiver.

9     That is also a very big strain.

10          MR. KREINDLER:  Since I only have a little more time I

11    won't argue.  I think it is.  But on the commercial activity

12    exception the point is here the one fact we can all agree on is

13    Deutsche Bahn is part of this seamless web of international

14    travel.  You can go on a computer or pick up the phone and with

15    one call book airfare, train fare, hotels, et cetera.

16          THE COURT:  I understand, but where does the computer

17    or the telephone go?  We have not yet reached the stage where

18    if you telephone from New York that gives New York

19    jurisdiction.

20          MR. KREINDLER:  I am off the jurisdiction point.  I am

21    making the argument that when you look at the commercial

22    activity exception it says there must be an effect here in the

23    United States.  The defendants say, well, the effect on the

24    families of the people who died these horrible deaths isn't

25    good enough and the cases have held that.

43FSREERS

1      THE COURT:  It says a direct effect.  It doesn't say

2  just an effect.

3      MR. KREINDLER:  All the newspaper stories publicizing

4  this awful disaster we think are a direct effect here in the

5  United States and discovery would bear that out.

6      THE COURT:  That is, you think newspaper reports about

7  an occurrence somewhere else constitute doing business?

8      MR. KREINDLER:  No, no, on the commercial activity

9  exception we think that a significant drop in business here is

10  a direct effect for purposes of the exception to the FSIA.

11      THE COURT:  And you are alleging that some company

12  here lost business?

13      MR. KREINDLER:  I think discovery will bear that out,

14  your Honor.  I am not talking about jurisdiction, I am just

15  talking about the commercial activity exception to Deutsche

16  Bahn's claim of immunity under the FSIA.

17      THE COURT:  Well, let me understand.  You are saying

18  that if you can show that publicity about the accident caused a

19  loss of business, that that constitutes proof of commercial

20  activity in the United States?

21      MR. KREINDLER:  That it constitutes --

22      THE COURT:  I would think they lost business in France

23  and in Germany.

24      MR. KREINDLER:  And here.  So assume that discovery

25  would show the number of Americans booking travel, including

43FSREERS

1    Deutsche Bahn, fell as a direct result of this accident and the

2    publicity, I think that is the sort of direct effect here in

3    the United States that qualifies under the exception.

4         THE COURT:  That is not bad for the United States.

5    Direct effect is something that causes harm here.

6         MR. KREINDLER:  It causes harm to businesses doing

7    business here.

8         THE COURT:  How is that?

9         MR. KREINDLER:  Well, I think it does.

10        THE COURT:  In any event, I hear your theory.

11        MR. KREINDLER:  I know you are going to ask if there

12   is a case.  To my knowledge, there has never been a case that

13   presented that issue.

14        THE COURT:  Of course not.

15        MR. HELLMICH:  Two quick points on the FSIA, your

16   Honor, I apologize but, first, even if you find that Deutsche

17   Bahn AG is immune that immunity, we know from Dole, does not

18   attach to the subsidiaries.

19        THE COURT:  That is correct, but you have to show that

20   the subsidiaries did something.

21        MR. HELLMICH:  That is right.  And that is not only in

22   the complaint but it's part of the jurisdictional analysis.

23   The other thing is even if you found Deutsche Bahn AG to have

24   immunity for subject matter jurisdiction purposes, that does

25   not mean -- and Dorfman stands for this proposition -- that we

1    cannot use Deutsche Bahn AG's 301 contacts in New York to get

2    jurisdiction over DBR&T, the German wholly-owned mere

3    department of DBAG.  So even if DBAG goes out --

4            THE COURT:  That is, you are saying that one

5    wholly-owned mere department can provide jurisdiction over

6    another mere department because both mere departments are

7    another company.

8            MR. HELLMICH:  DBAG as the common owner has many

9    subsidiaries that are acting as mere departments and by virtue

10   of the declaration shows they have overwhelming control of all

11   of them.

12           THE COURT:  But if they are mere departments you end

13   up taking yourself out of Dole is the problem.

14           MR. HELLMICH:  Dole is pretty clear --

15           THE COURT:  It is if you are recognizing they are

16   separate companies.  That is what Dole based on.

17

18           MR. HELLMICH:  Dole is and so does the mere department

19   test.  The mere department test assumes they are separate --

20           THE COURT:  No, it doesn't.  It says they are not

21   separate corporations.  They are mere departments.

22           MR. HELLMICH:  For practical purposes --

23           THE COURT:  You can't have it every which way.

24           MR. HELLMICH:  Your Honor, Dole says who owns the

25   subsidiary.  If direct ownership, if there is a subsidiary, if

43FSREERS

1    the foreign entity owns the parent --

2            THE COURT:  I am very familiar with Dole.  I have

3    recently had a whole series of problems under Dole.

4            MR. HELLMICH:  I understand.  Our jurisdictional

5    analysis says that from your departments you have to assume

6    that legally they are all separate entities.

7            THE COURT:  Why don't you give me an opinion that says

8    that specifically.  I don't think you can.

9            MR. HELLMICH:  That says for mere department tests --

10           THE COURT:  That what are mere departments can be

11   treated as being separate corporations for this purpose.

12           MR. HELLMICH:  They are certainly separate legal

13   entities but the effect is how they are being operated and

14   controlled.  We don't dispute there are separate legal

15   structures.

16           THE COURT:  That is the whole point of mere department

17   is that you are in effect bypassing the separation.

18           MR. HELLMICH:  Correct.

19           THE COURT:  I understand your position, and I

20   understand everybody's position, and I reserve decision.

21

22

23

24                              - - -

25