JUN. 3. 2004  5:54PM                                          NO. 6147   P. 2.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X
CAROLYN REERS, in her capacity as
Personal Representative of the Estates
of SUSANNE AMORE, deceased, and
SALVATORE MICHAEL AMORE, deceased,
KATHRYN MEYERS-TONUCCI, Individually
and in her capacity as Personal
Representative of the Estate of
JEANNE MEYERS AMORE, deceased, and
GEORGE GUERTIN, in his capacity as
Personal Representative of the
Estates of EMILY JEANNE AMORE,
deceased, and MICHAEL B. AMORE,
deceased,

              Plaintiffs,                03 Civ. 5360 (MGC)

    -against-                                  OPINION

DEUTSCHE BAHN AG, a Republic of Germany
Corporation, DEUTSCHE BAHN REISE &
TOURISTIK AG, a Republic of Germany
Corporation, DEUTSCHE BAHN AUTOZUG AG,
a Republic of Germany Corporation,
DEUTSCHE BAHN NACHTZUG AG, a Republic
of Germany Corporation, MR. VÖLKER,
an Individual, ACCOR SA, a Republic of
France Corporation, COMPAGNIE INTER-
NATIONALE DES WAGONS-LITS, a Republic
of France Corporation, and ISD-DSG
GmbH, a Republic of Germany Corporation,

             Defendants.

--------------------------------------X

APPEARANCES:

    Kreindler & Kreindler LLP
    Attorneys for Plaintiffs
    100 Park Ave.
    New York, NY 10017

    By:  James Kreindler

1

JUN. 3. 2004· 5:54PM                                        NO. 6147    P. 3

        Andrew J. Maloney, III
        Vincent I. Parrett
        Kristina Lingstaedt

    Patton Boggs LLP
    Attorneys for Plaintiffs
    2550 M St, NW
    Washington, DC 20037

    By: Read McCaffrey
        Christopher W. Heilmich

    Wilson, Elser, Moskowitz, Edelman & Dicker LLP
    Attorneys for Defendants Accor S.A. and Compagnie
    Internationale des Wagons-Lits
    150 E. 42nd St.
    New York, NY 10017

    By: Thomas A. Leghorn
        Brett Scher

    Wilson, Elser, Moskowitz, Edelman & Dicker LLP
    Attorneys for Defendants Deutsche Bahn AG, Deutsche Bahn
    AutoZug AG, Deutsche Bahn Reise & Touristik AG ("R&T"), and
    Janz Volker
    150 E. 42nd St.
    New York, NY 10017

    By: Thomas R. Cherry
        Richard Lerner


CEDARBAUM, J.

    Defendants Deutsche Bahn AG ("Deutsche Bahn"), Deutsche Bahn

AutoZug AG ("AutoZug"), Deutsche Bahn Reise & Touristik AG

("R&T"), Janz Volker, Accor S.A. ("Accor"), and Compagnie

Internationale des Wagons-Lits ("CIWLT"), move to dismiss the

complaint on various grounds, including sovereign immunity, lack

of personal jurisdiction, and forum non conveniens.  For the

following reasons, the motions are granted.


                            2

JUN. 3. 2004  5:54PM

NO. 6147   P. 4

## BACKGROUND

This case arises from the death of five members of the Amore family in a train accident in France. According to the allegations of the complaint, which are accepted as true for the purposes of this motion, the Amores embarked in Paris on an overnight train to Munich on November 6, 2002. The train was operated by the French national railway, Société Nationale Chemins de Fer Francais ("SNCF"), but the railcar to which the Amores were assigned, Railcar 120, was owned and operated by AutoZug, a subsidiary of defendant Deutsche Bahn, the nationally owned rail operator of Germany.

Shortly before two in the morning, the kitchenette of Railcar 120 caught fire. According to plaintiffs, defendant Volker, an employee of defendant R&T and the attendant assigned to Railcar 120 that night, started the fire and, failing to extinguish it, abandoned his post without warning the sleeping passengers in Railcar 120. The complaint further alleges that employees of Accor and CIWLT, who were working in cars adjacent to Railcar 120, failed to timely warn and evacuate the Amores after defendant Volker fled.

The fire quickly raged out of control, blocking the railcar's interior exits and preventing twelve passengers, including the Amores, from escaping. Although the fire was soon detected and the train stopped, rescue workers were unable to

08/03/2004 THU 17:51  [TX/RX NO 8777]  ☑004

JUN. 3. 2004  5:55PM

NO. 6147   P. 5

enter Railcar 120 because Volker had locked the exterior doors of
the railcar from the inside. The passengers trapped inside their
individual compartments were unable to break the windows. By the
time firefighters arrived and gained access to Railcar 120, the
twelve passengers inside were dead.

Plaintiffs, one of whom is suing individually and all of
whom are suing as representatives of the estates of the Amore
family, filed this wrongful death and survival action against
Volker and a number of corporate defendants connected either
directly or through their subsidiaries to the operation of the
train on which the Amores were traveling in France. Plaintiffs
assert claims of negligence, product liability, and breach of
implied warranty. Plaintiffs also seek punitive damages.

On December 11, 2003, plaintiffs consented to the dismissal
of two corporate defendants, Accor North America and Stinnes
Corporation. Plaintiffs have agreed to dismiss Deutsche Bahn
Nachzug, a defendant named in the caption and discussed in the
complaint, but whom plaintiffs concede does not exist.
Plaintiffs have also agreed to dismiss ISD-DSG GmbH, which did
not exist at the time of the accident and is in liquidation. The
remaining defendants now move to dismiss the complaint.

4 -

JUN. 3. 2004, 5:55PM                                        NO. 6147    P. 6

## DISCUSSION

The Deutsche Bahn defendants move to dismiss based on
sovereign immunity, lack of personal jurisdiction, forum non
conveniens, and the principle of abstention.  The Accor
defendants move to dismiss the complaint for lack of personal
jurisdiction, forum non conveniens, and failure to state a claim.

I.    Sovereign Immunity

Deutsche Bahn argues that this court has no subject matter
jurisdiction over the claims against it, because it is an agency
or instrumentality of a foreign sovereign and therefore immune
from suit pursuant to the Foreign Sovereign Immunities Act
("FSIA"), 28 U.S.C. §§ 1603-10.  As previously noted, Deutsche
Bahn is the national rail operator of Germany, wholly owned by
the German government.

The FSIA provides foreign states with immunity from suits in
American courts, subject to certain exceptions.  See Verlinden
B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489 (1983).
Section 1603 states that immunity extends not only to political
subdivisions, but also to agencies and instrumentalities of a
foreign state, defined as:

> [A]ny entity . . . (1) which is a separate legal
> person, corporate or otherwise, and (2) which is an
> organ of a foreign state or political subdivision
> thereof, or a majority of whose shares or other
> ownership interest is owned by a foreign state or

JUN. 3. 2004, 5:55PM

NO. 6147    P. 7

political subdivision thereof, and (3) which is neither
a citizen of a State of the United States . . . nor
created under the laws of any third country.

28 U.S.C. § 1603(b). Once a defendant makes a prima facie

showing that it is an agency or instrumentality of a foreign

state, the plaintiff must demonstrate that a statutory exception

to immunity applies. See Cargill Int'l S.A. v. M/T Pavel

Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993).

Plaintiffs concede that Deutsche Bahn is an instrumentality

of the Republic of Germany. They argue, however, that two of the

FSIA's exceptions remove the cloak of immunity from Deutsche Bahn

in this case.

The FSIA provides, in relevant part:

A foreign state shall not be immune from the
jurisdiction of courts of the United States or of the
States in any case--
(1) in which the foreign state has waived its immunity
either explicitly or by implication . . . ; [or]
(2) in which the action is based upon a commercial
activity carried on in the United States by the foreign
state; or upon an act performed in the United States in
connection with a commercial activity of the foreign
state elsewhere; or upon an act outside the territory
of the United States in connection with a commercial
activity of the foreign state elsewhere and that act
causes a direct effect in the United States . . . .

28 U.S.C. §1605(a).

Plaintiffs argue that Deutsche Bahn waived its immunity

pursuant to § 1605(a)(1) when Germany signed the Convention

Concerning International Carriage by Rail ("COTIF"), a treaty

that regulates litigation arising from railway transportation in

6

Case 1:06-cv-00198-RMU     Document 4-7     Filed 02/13/2006     Page 7 of 46

JUN. 3. 2004  5:55PM                                           NO. 6147   P. 8

signatory countries.  Plaintiffs claim, and defendants concede,
that each signatory of COTIF, including Germany, has waived its
sovereign immunity with respect to damage claims arising from its
railway transportation activities in other signatory countries.
Each signatory nation has also agreed that personal injury
actions arising from railway accidents can be filed only in the
country in which the injury occurred.  See Convention Concerning
International Carriage by Rail (May 9, 1980), app. A, art. 52,
§ 1.  Plaintiffs recognize that the United States is not a
signatory of this treaty, but argue that this explicit waiver of
immunity from suit in signatory countries is an implied waiver of
immunity from suit in the United States within the meaning of the
FSIA.

     Plaintiffs' reading of § 1605(a)(1) is too broad.  The
Second Circuit has stated that the FSIA's implied waiver
provision should be construed narrowly, see Transatlantic
Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d
384, 391 (2d Cir. 2000), and that such waivers should not be
found absent a showing of the sovereign defendant's intention to
waive immunity, see, e.g., Cargill, 991 F.2d at 1017.  Here,
Germany's ratification of COTIF constitutes a very narrow waiver
of sovereign immunity: signatory nations have not consented to
suit in any signatory nation, but only in the courts of the
country in which the injury giving rise to the suit occurred.

7

JUN. 3. 2004  5:55PM

NO. 6147   P. 9

Plaintiffs provide no justification for finding that through such
a limited waiver, Germany and its instrumentalities have
impliedly waived sovereign immunity for lawsuits arising in
nonsignatory jurisdictions and in countries other than the
country in which the injury giving rise to the suits occurred.

Plaintiffs also contend that this suit falls under
§ 1605(a)(2), the commercial activities exception to sovereign
immunity.  Because it is undisputed that the Amores purchased
their train tickets in Europe, and that all of the wrongdoing
alleged in the complaint occurred in Europe, the only subcategory
of the commercial activities exception potentially applicable
here is the third, which removes sovereign immunity when an
action is based upon "an act outside the territory of the United
States in connection with a commercial activity of the foreign
state elsewhere and that act causes a direct effect in the United
States."  28 U.S.C. § 1605(a)(2).

The parties do not dispute that Deutsche Bahn's provision of
rail transportation in Europe is a commercial activity.  The
significant question is whether the negligence, product defects,
and breach of warranty that allegedly contributed to the fire in
Railcar 120 -- the acts upon which the complaint is predicated --
had direct effects in the United States.

In Martin v. Republic of South Africa, 836 F.2d 91 (2d Cir.
1987), the Second Circuit held that personal injuries suffered by

8

an American abroad as a result of the tortious conduct of a
foreign sovereign cannot provide a basis for finding an exception
to immunity under § 1605(a)(2), see id. at 95.  In that case,
appellant alleged that he was injured in a car accident in South
Africa and was denied timely medical care because he was black.
See id. at 92.  He returned home a quadriplegic, and argued that
the pain, suffering, and financial loss that he consequently
suffered in the United States were direct effects of South
Africa's tortious conduct.  But because appellant suffered his
injuries and became a quadriplegic in South Africa, the court
reasoned that "it cannot be said that the effects of South
Africa's acts occurred 'in the United States.'"  Id. at 94.  The
court drew on the reasoning of the leading Second Circuit case to
parse the meaning of "direct effect in the United States," Texas
Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d
300 (2d Cir. 1981).  Texas Trading held that Nigeria's
repudiation of contracts with American corporations had a direct
effect in the United States because the plaintiffs' financial
loss occurred here: the contracts provided for payment in the
United States from a New York bank, and the plaintiffs were
injured when Nigeria withheld that payment.  See id. at 312; see
also Martin, 836 F.2d at 94.  The Texas Trading court also
suggested that cases involving personal injuries sustained by
Americans abroad are both analytically distinct from and easier

9

JUN. 3. 2004  5:56PM                                            NO. 6147   P. 11

to resolve than contract claims by corporations.  The court noted
that personal injuries are "undoubtedly . . . 'direct' effects,"
Texas Trading, 647 F.2d at 312; and that when an individual is
injured overseas, "it is easy to locate the 'effect' outside the
United States" id. at 312 n.35.

   Texas Trading also approved the reasoning of Harris v. VAO
Intourist, Moscow, 481 F. Supp. 1056 (E.D.N.Y. 1979), a wrongful
death action arising from the death of an American citizen in a
fire in a Moscow hotel.  In rejecting the plaintiff's argument
that the commercial activities exception of the FSIA barred the
defendants' claim of sovereign immunity, Judge Weinstein wrote:

> Obviously the negligent operation of a hotel in Moscow
> causing the death of a United States resident has
> effects in the United States; here it leaves aggrieved
> relatives in this country. But the precise issue is not
> whether the fire had any effect here, but whether it
> had a "direct effect" in the United States within the
> meaning of the statutory language. Indirect injurious
> consequences within this country of an out-of-state act
> are not sufficient contacts to satisfy the "direct
> effect" requirement of section 1605(a)(2).

Id. at 1062.  See also Close v. Am. Airlines, 587 F. Supp. 1062,
1064-65 (S.D.N.Y. 1984) (holding that an American citizen could
not recover for injuries caused abroad by a foreign airline).

   Plaintiffs allege that Deutsche Bahn's conduct outside the
United States caused the losses suffered here by the Amores'
surviving relatives, as well as economic losses to Deutsche Bahn
itself resulting from a decline in its United States business
following extensive publicity about the accident.  But the direct

10

JUN. 3. 2004 5:56PM                                    NO. 6147   P. 12

effects of the conduct alleged were the deaths of the Amores in France, and the cases cited above demonstrate that those extraterritorial effects do not provide an exception to Deutsche Bahn's sovereign immunity. Therefore, the claims against Deutsche Bahn are dismissed for lack of subject matter jurisdiction.

II.   Personal Jurisdiction

Plaintiffs bear the burden of establishing that the court may exercise personal jurisdiction over the remaining defendants. CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986). When, as here, a motion to dismiss for lack of personal jurisdiction is decided before discovery and without an evidentiary hearing, a plaintiff need only make a prima facie showing of personal jurisdiction. See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001). All pleadings and affidavits are construed in the light most favorable to the plaintiffs, and all doubts are resolved in their favor. See id.

A federal court sitting in diversity must apply the law of the forum state in determining whether it may exercise personal jurisdiction over an out-of-state defendant. Savin v. Ranier, 898 F.2d 304, 306 (2d Cir. 1990). If the applicable statute of the forum state allows the court to exercise personal jurisdiction, the court must then determine whether the

11

JUN. 3. 2004  5:56PM                                                      NO. 6147   P. 13

constitutional standards of due process are met.  Id.

Because this lawsuit does not arise out of any activity by the nonresident defendants within the state of New York, plaintiffs rely on New York's "general jurisdiction" provision, N.Y. C.P.L.R. § 301.  Personal jurisdiction over a corporation exists pursuant to § 301 if the corporation is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence in this jurisdiction.'"  Laufer v. Ostrow, 55 N.Y.2d 305, 309-10 (1982) (quoting McGowan v. Smith, 52 N.Y.2d 268, 272 (1981)).  Section 301 jurisdiction, which subjects a nondomiciliary corporation to suits unrelated to its contacts with New York, is appropriate only if the corporation does business in New York "not occasionally or casually, but with a fair measure of permanence and continuity."  Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985) (quoting Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267 (1917)).

As discussed in greater detail below, plaintiffs fail to make a prima facie showing of personal jurisdiction over AutoZug and R&T.  There are also serious questions whether this court can exercise jurisdiction over Accor and CIWLT.

A.    The Remaining Deutsche Bahn Defendants

AutoZug and R&T are two German corporations whose principal

12

Case 1:06-cv-00198-RMU    Document 4-7    Filed 02/13/2006    Page 13 of 46

JUN. 3. 2004  5:56PM                                    NO. 6147.  P. 14

business is long-distance passenger train travel in Europe.  R&T
is a wholly owned subsidiary of an entity called DB
Personenverkehr, which is itself a wholly owned subsidiary of
Deutsche Bahn.  AutoZug is a wholly owned subsidiary of R&T.
Thus, each subsidiary exists several rungs down the corporate
ladder from Deutsche Bahn.

Plaintiffs have alleged no direct contacts between AutoZug
and New York, and only one such contact between R&T and New York.
Specifically, plaintiffs allege that R&T contracted directly with
U.S. airlines which have operations in New York to develop "rail
and fly" packages for U.S. customers.  This allegation is
insufficient because it does not show that R&T conducted a
continuous course of business in New York, or even that R&T
solicited or executed these contracts in New York.  The existence
of contractual relationships with entities that happen to have
operations in New York does not establish § 301 jurisdiction,
because it does not show extensive conduct directed toward or
occurring in New York.  See Mantello v. Hall, 947 F. Supp. 92, 98
(S.D.N.Y. 1996).

Plaintiffs also rely on mere department and agency theories
to argue that jurisdiction over these defendants is proper.  Each
of these is discussed in turn below.

13

JUN. 3, 2004  5:56PM                                          NO. 6147   P. 15

1.   AutoZug and R&T as "Mere Departments" of Deutsche Bahn

     First, plaintiffs contend that these German subsidiaries are
"mere departments" of Deutsche Bahn, and accordingly share the
jurisdictional contacts of their parent. See Volkswagenwerk
Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120-22
(2d Cir. 1984). A corporate entity that is present in New York
will be considered a "mere department" of a foreign parent, so as
to expose the parent to personal jurisdiction in New York, "only
if the foreign parent's control is pervasive enough that the
corporate separation is more formal than real," Palmieri v.
Estefan, 793 F. Supp. 1182, 1187 (S.D.N.Y. 1992) (quoting H.
Heller & Co. v. Novacor Chemicals Ltd., 726 F. Supp. 49, 54
(S.D.N.Y. 1988)). This theory, of course, requires an initial
finding that Deutsche Bahn itself is doing business in New York,
and plaintiffs offer a number of alternative theories to support
such a finding: that Deutsche Bahn itself has numerous direct
contacts with New York, that Deutsche Bahn is doing business
through other mere departments located in New York, or that
Deutsche Bahn is doing business through various New York-based
agents.

     There is a serious problem with plaintiffs' attempt to
premise personal jurisdiction over the German subsidiaries on
Deutsche Bahn's contacts with New York. Deutsche Bahn is immune
from suit in the United States. By alleging that these

                              14

JUN. 3. 2004 5:57PM                                    NO. 6147    P. 16

subsidiaries are mere departments of Deutsche Bahn, plaintiffs

are alleging that the subsidiaries are not separate corporate

entities at all, but rather alter egos of an immune entity. If,

as plaintiffs insist, the subsidiaries' independent corporate

form is a mere facade, and Deutsche Bahn exerts pervasive control

over them, then the entities must share Deutsche Bahn's immunity.

Cf. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., No. 97

Civ. 6124 (JGK), 1999 WL 307666, at *11 (S.D.N.Y. May 17, 1999),

aff'd, 199 F.3d 94, 97 (2d Cir. 1999) (finding that the

defendant, a corporate subsidiary of a subsidiary of Petrobras,

an instrumentality of Brazil, was also an alter ego of Petrobras,

and would have been entitled to sovereign immunity under the FSIA

except that a statutory exception to immunity applied). To

permit plaintiffs to sue AutoZug and R&T in New York would,

according to plaintiffs' own allegations, be tantamount to

permitting plaintiffs to sue Deutsche Bahn, a foreign sovereign.

Plaintiffs respond that the rule of Dole Food Co. v.

Patrickson, 538 U.S. 468 (2003), mandates a finding that these

subsidiaries are not immune under the FSIA. In Dole, the Supreme

Court held that indirect subsidiaries of a foreign state do not

qualify as agencies or instrumentalities under the FSIA, because

they do not satisfy the statutory requirement of majority

ownership by a foreign state or political subdivision. See id.

at 474; see also 28 U.S.C. § 1603(b)(2). But according to

06/03/2004 THU 17:51  [TX/RX NO 6777]  ☑016

JUN. 3. 2004  5:57PM

NO. 6147    P. 17

plaintiffs' own allegations, AutoZug and R&T are not subsidiaries indirectly owned by Germany, but "mere departments" of Germany's agency or instrumentality, Deutsche Bahn. Dole did not address such allegations. Essentially, plaintiffs ask this court to ignore the corporate form for purposes of the jurisdictional analysis and to defend it rigorously with respect to the FSIA analysis. Plaintiffs cannot have it both ways. The mere department test, as discussed in greater detail below, "requires an examination of economic realities, not formal relationships." Mavatextil, S.A. v. Liztex U.S.A., Inc., No. 92 Civ. 4528 (SS), 1995 WL 131774, at *5 (S.D.N.Y. Mar. 23, 1995). If AutoZug and R&T are mere departments of Deutsche Bahn, then this court lacks subject matter jurisdiction over the claims against them. If they are separate corporate entities, then plaintiffs cannot attribute Deutsche Bahn's contacts to the subsidiaries for purposes of personal jurisdiction.

2.    DER/REG and Deutsche Bahn as the Agents of R&T and AutoZug

Alternatively, plaintiffs contend that AutoZug and R&T are doing business in New York through an agent. "[A] court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently

16

JUN. 3. 2004  5:57PM                                    NO. 6147   P. 18

important to the foreign entity that the corporation itself would
perform equivalent services if no agent were available." Wiwa v.
Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000). So,
for example, in the leading New York case on agency jurisdiction,
Frummer v. Hilton Hotels International, Inc., 19 N.Y.2d 533
(1967), the Court of Appeals held that New York courts could
assert jurisdiction over a British Corporation, Hilton Hotels
(U.K.) Ltd., based on the activities of the Hilton Reservation
Service, an entity doing business in New York.  The New York
entity responded to requests for rate quotations from travel
agents, confirmed reservations, performed publicity and public
relations work, and otherwise generated business for the London
corporation.  See id. at 537.  In short, the court found that
"the Service does all the business which Hilton (U.K.) could do
were it here by its own officials."  Id.  See also Wiwa, 226 F.3d
at 95-96 (asserting personal jurisdiction over defendant foreign
holding companies based on the activities of their New York
Investor Relations Office, which was fully funded by the
defendants, consulted them on major decisions, and whose sole
function was to act on their behalf); Gelfand v. Tanner Motor
Tours, Ltd., 385 F.2d 116, 120-21 (2d Cir. 1967) (premising
jurisdiction over an Arizona tour operator upon the activities of
a New York travel agent that confirmed reservations and performed
other services on behalf of operator); Miller v. Surf Props.,

JUN. 3. 2004  5:57PM

NO. 6147    P. 19

Inc., 4 N.Y.2d 475, 481 (1958) (holding that a travel agency that
responded to telephone inquiries, mailed brochures, and accepted
deposits for many Florida hotels was not the agent of one of
those hotels for the purposes of personal jurisdiction).

Plaintiffs argue that these German subsidiaries of Deutsche
Bahn are doing business in New York through what is actually two
separate entities: Destination Europe Resources ("DER") and Rail
Europe Group ("REG"). REG is based in White Plains, New York.
Plaintiffs note that REG advertises itself as the official North
American representative of sixty European railways. REG owns
DER, a travel wholesaler. Plaintiffs argue that DER/REG
functions as the New York agent of AutoZug and R&T through
activities it performs on behalf of their corporate ancestor,
Deutsche Bahn: Deutsche Bahn holds DER out as its general agent
in the United States on its website for international customers;
Deutsche Bahn encourages U.S. customers to purchase all their
tickets through DER/REG; and Deutsche Bahn generates significant
revenue from ticket sales by DER/REG. Although all of these
allegations involve the parent corporation, not the subsidiaries,
plaintiffs contend that DER/REG's activities are sufficiently
significant to the business of the subsidiaries, and that the
agency theory of jurisdiction is sufficiently broad, to support a
finding of jurisdiction over the subsidiaries.

There are several problems with plaintiffs' argument.

18

JUN. 3. 2004, 5:57PM                                    NO. 6147   P. 20

Plaintiffs make no allegations sufficient to justify the
conflation of two distinct entities -- DER and REG. Why
plaintiffs choose to combine DER and REG is clear from Deutsche
Bahn's website, which was included as an exhibit attached to
plaintiffs' opposition papers: DER, the entity that Deutsche Bahn
holds out as its general agent in the United States, is located
in Rosemont, Illinois. The activities of an Illinois-based
organization cannot support a finding that AutoZug and R&T are
doing business through an agent in New York. And the activities
of REG alone do not support plaintiffs' argument. Plaintiffs
concede that REG serves sixty European railways, not Deutsche
Bahn and its subsidiaries exclusively. To find that a
corporation is doing business in New York through an agent, a
plaintiff must show that the agent is "primarily employed by the
defendant and not engaged in similar services for other clients."
Wiwa, 228 F.3d at 95; see also Jacobs v. Felix Bloch Erben Verlag
fur Buhne Film und Funk KG, 160 F. Supp. 2d 722, 737 (S.D.N.Y.
2001); Miller, 4 N.Y.2d at 481. Plaintiffs' allegations indicate
only that REG is an independent contractor. Deutsche Bahn's use
of REG to sell train tickets in the United States is insufficient
to support a prima facie determination that Deutsche Bahn or its
subsidiaries are doing business in New York. Furthermore,
plaintiffs have not offered a single factual allegation that
shows that DER/REG performs any activity in New York on behalf of

19

JUN. 3, 2004  5:57PM                                              NO. 6147   P. 21

AutoZug and R&T, as opposed to Deutsche Bahn.

Plaintiffs also argue that Deutsche Bahn itself acts as its subsidiaries' agent in New York.  Again, the complaint contains no allegations that Deutsche Bahn performs any activity in New York on behalf of its subsidiaries.  Plaintiffs rely far too heavily on language in the case law that suggests that common ownership "gives rise to a valid inference as to the broad scope" of an agency relationship.  Frummer, 19 N.Y.2d at 537.  Taken to its logical extreme, their position would make every parent the agent of each of its subsidiaries for jurisdictional purposes, and vice versa.  But plaintiffs must also show that the agent rendered important services on behalf of its principal.  This they have failed to do.

Plaintiffs have not made a prima facie showing that this court has personal jurisdiction over AutoZug and R&T.

Since there is no jurisdiction in New York over any of the Deutsche Bahn defendants, it is not necessary to reach their argument that this court should abstain from hearing this case in deference to the legal proceedings ongoing in France.


B.   Janz Volker

Defendant Volker also moves to dismiss for lack of personal jurisdiction.  Plaintiffs offer no allegations with respect to Volker's contacts with the United States.  Therefore, they have

JUN. 3. 2004  5:58PM                                    NO. 6147   P. 22

failed to make a prima facie showing of personal jurisdiction over Volker.

## C.  The Accor Defendants

Accor is a corporation organized under the laws of France. It maintains a registered office in Evry, France.  It possesses ownership interests in numerous hotel and tourism-related corporations around the world.

CIWLT is a corporation organized under the laws of Belgium. It maintains a registered office in Brussels.  CIWLT provides travel-related services throughout continental Europe, focusing on sleeping and dining car services on European trains.  Accor has a 99.48% ownership interest in CIWLT.

### 1.  Accor

Plaintiffs offer two theories to support the exercise of jurisdiction over Accor: first, that Accor itself maintains sufficient contacts with New York to fulfill the "doing business" standard of § 301; and second, that the jurisdictional contacts of Accor Leisure, a "mere department" of Accor that is doing business in New York, are properly attributable to the parent. Each of these theories is considered in turn.

06/03/2004 THU 17:51  [TX/RX NO 8777] @022

JUN. 3. 2004  5:58PM

a)    <u>Accor's Activities in New York</u>

In determining whether a corporation does business in New
York with sufficient regularity to make it amenable to personal
jurisdiction under § 301, a court should consider whether the
corporation maintains offices, bank accounts, or other property
in New York; whether employees of the corporation are present in
New York; and whether the corporation solicits business in New
York.  <u>See Hoffritz</u>, 763 F.2d at 58.  "Solicitation of business
alone will not justify a finding of corporate presence in New
York with respect to a foreign manufacturer or purveyor of
services, but when there are activities of substance in addition
to solicitation there is presence and, therefore, jurisdiction."
<u>Laufer</u>, 55 N.Y.2d at 310 (internal citation omitted); <u>see also
Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.</u>, 918
F.2d 1039, 1043-44 (2d Cir. 1991).

The plaintiffs cite the following contacts as sufficient to
support general jurisdiction over Accor:

(1)  Accor owns more than 15 businesses that are registered to
conduct business in New York, and its North American subsidiaries
accounted for 22% of its revenue in 2002.

(2)  Accor maintains a web of internet sites linking its various
subsidiary hotels.  Through these websites, Accor solicits U.S.
businesses (including New York businesses) to join its affiliate
program.  By placing a link to Accor's website on its website, a

22

JUN. 3. 2004  5:58PM

NO. 6147   P. 24

member of the affiliate program can receive compensation for every booking that Accor obtains through customers directed to it by an affiliate.

(3)  Accor encourages U.S. customers (including New York residents) to join one of its "loyalty programs," through which they can earn credit toward discounts at Accor hotels.

(4)  In 1999, Accor announced that it was acquiring Red Roof Inns and Motel 6.  As part of this acquisition, it received a commitment from Morgan Stanley Real Estate Fund LP to tender its 68.3% stake in those hotel chains.  The Morgan Stanley Real Estate Fund is owned by Morgan Stanley Group, Inc., a Delaware company whose principal office is located in New York City.

(5)  Accor hired a New York law firm, Proskauer Rose LLP, to perform the legal work necessary to complete these acquisitions, and hired New York-based J.P. Morgan & Company to provide financial advice.

(6)  Accor formed a joint venture with a New York venture capital firm, the Blackstone Group, to acquire 52 hotels from Vivendi.

(7)  Accor owns two bank accounts in New York.

(8)  Accor stock can be purchased in New York on the over-the-counter exchange.  The Bank of New York trades Accor's American Depository Receipts, and Merrill Lynch trades Accor's ordinary shares.  Between 11% and 16.7% of Accor's equity shares have been held by U.S. institutional or individual investors at various

23

JUN. 3. 2004  5:58PM                                                    NO. 6147    P. 25

times.

(9)  Accor conducted thirty "roadshows" in Europe and the United
States in 2002 to promote its equity offerings to potential
investors, "presumably" with the assistance of one of its New
York-based market makers.

(10)  Accor authorized a subsidiary, Accor Economy Lodging Inc.,
which is registered to do business in New York, to file a Form D
with the Securities and Exchange Commission ("SEC") regarding a
stock issuance.

(11)  Accor retained the services of three New York-based
investment banks to manage a $680 million bond offering in 2001.

(12)  Accor maintains strategic partnerships with U.S. companies,
such as Delta Airlines.  New York residents who are members of
Delta's SkyMiles program can earn credit toward discounts on
goods and services through stays in Accor hotels.

(13)  Accor has two partnerships with New York-based American
Express Company, which involve jointly branded charge cards and a
"points" program.

(14)  American Express has also owned as much as one percent of
Accor stock, making it at one time Accor's fifth largest
shareholder.

(15)  Accor's worldwide internet reservation system generates
revenue from New York residents who make reservations for stays
at Accor hotels, as well as from non-New York residents who

24

JUN. 3. 2004 , 5:58PM

NO. 6147    P. 26

reserve rooms at New York hotels owned by subsidiaries of Accor.
(16)  Accor owns 50% of Carlson WagonLit Travel, a travel agency
with offices in New York.

These are isolated and scattershot contacts, not the
substantial, continuous, and permanent contacts required to
support § 301 jurisdiction.  Most of them also suffer from other
serious deficiencies.

Plaintiffs attempt to blur the line between Accor's contacts
with the United States and its contacts with the State of New
York.  Because this is a diversity suit; it is defendant's
contacts with the forum state, not with the United States as a
whole, that are relevant to the personal jurisdiction inquiry.
Conduct directed toward the United States (or, in the case of
some of these purported activities, toward the world generally),
cannot subject a defendant to personal jurisdiction in a
particular state.  Accordingly, while New York residents can
benefit from Accor's affiliate program, loyalty programs,
internet reservation system, and partnership with Delta Airlines,
those benefits do not result from Accor's having reached into New
York to solicit business here, but from the fact that access to
these programs is available to anyone in the United States who
seeks them out.  See, e.g., Drucker Cornell v. Assicurazioni
Generali S.p.A., Nos. 97 Civ. 2262 (MBM), 98 Civ. 9186 (MBM),
2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (finding that the

25

JUN. 3. 2004  5:58PM                                         NO. 6147   P. 27

exercise of personal jurisdiction on the basis of a website
available worldwide, without an allegation that the website was
purposefully directed toward New York, would offend due process).
Plaintiffs cannot cure this deficiency by tacking on a reference
to New York residents, as they do in several of the allegations
summarized above, because it is clear that the thrust of Accor's
activity is not directed toward New York.

　　　Other allegations similarly lack a New York focus.
Plaintiffs do not allege that any of Accor's thirty roadshows
were conducted in New York, or that any of the owners of Accor
securities are New York residents or entities.  Plaintiffs do not
allege that Accor Lodging filed forms with the SEC on Accor's
behalf in New York.  And plaintiffs do not allege that Accor
retained the services of New York investment banks or law firms
for bond offerings or corporate acquisitions in New York.  See
PaineWebber Inc. v. Westgate Group, Inc., 748 F. Supp. 115, 120
(S.D.N.Y. 1990) (finding a corporation's retention of New York
law firm to provide services outside of New York to be
insufficient to confer jurisdiction).

　　　Plaintiffs' allegations that focus more directly on New York
suffer from problems as well.  The mere fact that Accor owns or
partially owns businesses that are registered to do business in
New York does not subject Accor to general jurisdiction in New
York.  See Ontel Prods., Inc. v. Project Strategies Corp., 899 F.

26

Supp. 1144, 1148 (S.D.N.Y. 1995) ("In New York, the individual who owns a corporation is generally not subject to personal jurisdiction as a result of the corporation's activities unless (1) the corporate veil can be 'pierced' or (2) the corporation acted as an agent for the owner."). Neither is jurisdiction proper merely because Accor operates websites through which New York residents can make hotel reservations or purchase other services. See Rodriguez v. Circus Circus Casinos, Inc., No. 00 Civ. 6559 (GEL), 2001 WL 21244, at *2 (S.D.N.Y. Jan. 9, 2001) (finding no general jurisdiction over foreign corporation based on website accessible to New York residents); Drucker Cornell, 2000 WL 284222, at *2.

Several of plaintiffs' allegations depend on Accor's having done business with entities that are based in New York. None of these allegations, however, indicates whether Accor solicited its partners' participation in New York or whether any of the business was conducted in New York. "The mere existence of a business relationship with entities within the forum state is insufficient to establish 'presence.'" Mantello, 947 F. Supp. at 98 (quoting Insurance Co. of Pennsylvania v. Centaur Insurance Co., 590 F. Supp. 1187, 1189 (S.D.N.Y. 1984)). Accordingly, Accor's acquisition of hotels from a subsidiary of the Morgan Stanley Group, its joint venture with the Blackstone Group, and its partnerships with Delta Airlines and American Express do not

27

JUN. 3. 2004 5:59PM

NO. 6147   P. 29

support an exercise of personal jurisdiction absent allegations of purposeful conduct in New York.

Although Accor's ownership of two bank accounts located in New York is one factor relevant to the jurisdictional inquiry, bank accounts standing alone cannot create jurisdiction unless they are used for "substantially all" of Accor's business. See United Rope Distribs. v. Kimberly Line, 785 F. Supp. 446, 450 (S.D.N.Y. 1992). Plaintiffs do not make such a claim. Similarly, the fact that Accor's stock may be purchased in New York, and that Accor retains New York-based market makers to assist in its sales of stock, is another important factor but is insufficient to confer general jurisdiction. See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 230 F. Supp. 2d 376, 383 (S.D.N.Y. 2002).

There is a serious question whether plaintiffs have demonstrated that Accor solicits substantial amounts of business in New York. It is also not clear whether the other contacts which actually involve conduct in New York, such as the maintenance of bank accounts and the sale of securities, constitute additional "activities of substance" sufficient to justify jurisdiction. Laufer, 55 N.Y.2d at 310.

b)   Accor Leisure as Accor's "Mere Department"

Alternatively, plaintiffs contend that personal jurisdiction

28

JUN. 3. 2004 5:59PM                                      NO. 6147   P. 30

over Accor is proper because Accor's "mere department," Accor
Leisure, is present and doing business in New York. The Second
Circuit has outlined four factors to aid in determining whether
one entity is the mere department of another: (1) common
ownership; (2) financial dependency of the subsidiary on the
parent; (3) the degree to which the parent interferes in the
selection of the subsidiary's executive personnel and fails to
observe corporate formalities; and (4) the extent of the parent's
control over the subsidiary's marketing and operational policies.
Beech Aircraft, 751 F.2d at 120-22; Aboud v. Rapid Rentals, No.
97 Civ. 1742 (MGC), 1998 WL 132790, at *1 (Mar. 24, 1998). The
first factor, common ownership, is "essential to the assertion of
jurisdiction over a foreign related corporation," while the other
three factors are "important." Beech Aircraft, 751 F.2d at 120.
"The overall weighing of the various factors thus necessitates a
balancing process, and not every factor need weigh entirely in
the plaintiffs' favor." Aboud, 1998 WL 132790, at *1 (quoting
Mayatextil, 1995 WL 131774, at *5) (citations omitted). However,
the analysis requires more than an identity of ownership. A
parent cannot assume the jurisdictional status of its subsidiary
unless factors beyond common ownership suggest that their
separate corporate identities are a mere facade. See, e.g.,
Palmieri, 793 F. Supp. at 1188-89 (citing cases applying the four
factors).

According to plaintiffs, all of Accor's subsidiaries are
mere departments of Accor, and the following allegations
demonstrate that Accor Leisure, in particular, is a mere
department of Accor. Accor owns 90% or more of Accor Leisure.
Accor sets the financial guidelines for all of its subsidiaries.
Specifically, Accor implements cost reduction plans, controls
bond offerings, manages financial risks, develops operating
budgets, approves capital expenditures, and handles insurance
coverage. Accor also interferes with personnel assignments by
appointing the heads of its subsidiaries. Accor directs that all
of its subsidiaries use a uniform logo that incorporates the
Accor name. Accor has also centralized employee recruitment for
all of its subsidiaries and developed training programs. Accor
has centralized its corporate sales departments, developed a
groupwide employee incentive program, and formulated a worldwide
environmental policy and hotel risk prevention committee. Accor
also controls collective bargaining for all of its European
hotels. Finally, Accor's technology links the reservation
systems of all of its subsidiaries.

It is a close question whether these allegations constitute
a prima facie showing of jurisdiction over Accor in New York.
Aside from common ownership, plaintiffs make only one factual
allegation specifically about Accor Leisure: that the parent
selected the executive in charge of Accor Leisure. The rest of

JUN. 3. 2004  5:59PM                                          NO. 6147   P. 32

plaintiffs' allegations refer generally to all of Accor's
subsidiaries, to the activities of other of Accor's North
American subsidiaries, or to subsidiaries in other parts of the
world.

Even if plaintiffs could show that their generalized
allegations about Accor's dealings with its subsidiaries apply
with equal weight to Accor Leisure, it is not clear that those
allegations demonstrate the pervasive control required to justify
jurisdictional veil piercing.  Most courts have held that the
financial dependency prong of the Beech Aircraft test requires
not merely that the parent have some control over the finances of
the subsidiary, but that the subsidiary would not be able to
function without the financial support of the parent.  See
Meteoro Amusement Corp. v. Six Flags, 267 F. Supp. 2d 263, 271
(N.D.N.Y. 2003); Dorfman v. Marriott Int'l Hotels, Inc., No. 99.
Civ. 10496 (CSH), 2002 WL 14363, at *8 n.12 (S.D.N.Y. Jan. 3,
2002) (noting that when assessing financial dependency, courts
typically consider "whether the two companies' accounts have been
intermingled, the parent has paid the subsidiary's expenses, the
parent has loaned money to the subsidiary without interest, or
the parent has guaranteed the subsidiary's obligations").  While
plaintiffs have alleged facts indicating that Accor has some
measure of control over the broad financial policies of its
subsidiaries, they have not clearly alleged dependency.

31

JUN. 3. 2004  5:59PM

NO. 6147   P. 33

Similarly, control over personnel decisions requires more
than the parent's appointment of a few of the subsidiary's
officers or directors. See Jazini v. Nissan Motor Co., Ltd., 148
F.3d 181, 185 (2d Cir. 1998) (affirming district court's
determination that the fact that one of Nissan Japan's four
managing directors was also the chairman of Nissan U.S.A. was
insufficient to show that the latter was a mere department of the
former). Management personnel of two related corporations
usually must be "substantially the same" or demonstrate "mirror
image symmetry" for this factor to contribute to a finding that a
subsidiary is a mere department of a parent. See, e.g., Salt
Intern. (HK) Ltd. v. La Salle National Bank, No. 01 CV 4291(RCC),
2002 WL 500372, at *3 (S.D.N.Y. Mar. 29, 2002) (citing cases).
Plaintiffs only allege that Accor named the head of Accor
Leisure, which is not an extraordinary act within the context of
the parent-subsidiary relationship.

With respect to marketing policies, the fact that
subsidiaries share a logo, or that the parent decides to present
several corporations on a website in a unified fashion, is
insufficient to show lack of formal separation between two
entities. See J.L.B. Equities, Inc. v. Ocwen Fin. Corp, 131 F.
Supp. 2d 544, 550 (S.D.N.Y. 2001) (finding a failure to
distinguish between parent and subsidiary on website insufficient
to indicate lack of formal separation: "[a]n advertising strategy

32

JUN. 3. 2004  6:00PM                                    NO. 6147  P. 34

deciding not to present to its consumers the existence of a
parent-subsidiary relationship is not equivalent to a showing
that the parent corporation exercises any control over its
subsidiary's operational or marketing activities"). Finally, it
is not clear whether plaintiffs' allegations with respect to
Accor's employment, environmental, risk prevention, and other
policymaking show anything more than the ordinary control that
parent corporations exert over their subsidiaries. It is true
that a parent's imposition of operational policies upon its
subsidiaries can, in some instances, provide evidence of
pervasive control. See, e.g., Dorfman, 2002 WL 14363, at *9.
However, plaintiffs have not alleged that Accor interferes in the
day-to-day operations of Accor Leisure, or that it has exerted
control over the standard operating procedures of its
subsidiaries. The policies plaintiffs describe are not central
or essential to the way in which Accor's subsidiaries conduct
their business. "[U]nder New York law a parent of a
multinational corporate enterprise may make broad policy
decisions for its subsidiaries. Such control is inherent in the
parent-subsidiary relationship and does not justify labeling a
subsidiary a 'mere department' of the parent." Saraceno v. S.C.
Johnson & Son, Inc., 83 F.R.D. 65, 71 (S.D.N.Y. 1979).

    Plaintiffs have proffered evidence that Accor exercises the
kind of control over its subsidiaries typical in any parent-

06/03/2004 THU 17:51  [TX/RX NO 6777]  ☒034

JUN. 3. 2004  6:00PM                                    NO. 6147   P. 35

subsidiary relationship.  Whether they have alleged the kind of
extraordinary control that would justify a finding that Accor
Leisure is a mere department of Accor is questionable.

2.    Compagnie Internationale des Wagons-Lits

    Jurisdiction over CIWLT depends on a determination that this
court has personal jurisdiction over its parent, Accor, and then
on a determination that CIWLT is a mere department of Accor and
should share the jurisdictional contacts of its parent.

    As discussed above, a serious question exists as to whether
plaintiffs have made a prima facie showing of personal
jurisdiction over Accor.  Accordingly, it is not clear that this
court has personal jurisdiction over CIWLT.  Although discovery
limited to the jurisdictional question would ordinarily be in
order in this situation, defendants' motion to dismiss can be
granted on the alternative ground that New York is an
inconvenient forum for this litigation, as discussed below.


III. Forum Non Conveniens

    The Accor defendants contend that New York is a manifestly
inconvenient forum for this litigation.  "The 'central purpose'
of forum non conveniens analysis is to determine whether a trial
will be most convenient and will serve the interest of justice."
Virgin Atlantic Airways Ltd. v. British Airways PLC, 872 F. Supp.

34

52, 61 (S.D.N.Y. 1994). The analysis proceeds according to the
test set forth in the leading Supreme Court case on forum non
conveniens, Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).
Starting with the proposition that the "plaintiff's choice of
forum should rarely be disturbed," id. at 508, the defendant must
show that an adequate alternative forum exists, see Piper
Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1982). Only if
defendant meets that threshold requirement should the court
proceed to the private and public interest factors set forth in
Gilbert. See id.; see also Carey v. Bayerische Hypound
Vereinsbank AG, -- F.3d --, No. 03-7819, 2004 WL 1194391, at *2
(2d Cir. June 1, 2004).


A.    France as an Adequate Alternative Forum

     Generally, the alternative forum a defendant proposes is
adequate as long as the defendant is amenable to process there
and the forum permits litigation of the subject matter of the
suit. See id. at 254 n.22. It is undisputed that all the
corporate defendants are amenable to suit in France. Accor is a
French corporation, and CIWLT concedes that it is subject to
jurisdiction in France based on regularly conducted business
activities. Deutsche Bahn has a treaty obligation to submit to
jurisdiction in France.

     Plaintiffs contend that France is not an adequate forum

35

JUN. 3. 2004  6:00PM                                    NO. 6147    P. 37

because the remedy French courts would provide to them is
unsatisfactory. Plaintiffs offer the declaration of Alain Behr,
a French attorney, who states that the maximum compensation that
would be available to each estate in a French court would be
approximately $100,000. Plaintiffs argue that such a remedy is
clearly inadequate, given the terrible circumstances of the
Amores' deaths and the seriousness of the misconduct alleged.

    Plaintiffs are correct that "in rare circumstances . . .
where the remedy offered by the other forum is clearly
unsatisfactory, the other forum may not be an adequate
alternative." Id. But Piper is clear that an "unsatisfactory
remedy," in this context, means no remedy at all. The Piper
Court was concerned about situations in which the alternative
forum does not recognize a plaintiff's cause of action, refuses
to permit litigation of the subject matter of the suit, or is
otherwise seriously flawed. See id. at 254 & n.22. Accordingly,
the Piper Court found that Scotland was an adequate forum in a
case involving a plane crash in that country: "Although the
relatives of the decedents may not be able to rely on a strict
liability theory, and although their potential damages award may
be smaller, there is no danger that they will be deprived of any
remedy or treated unfairly." Id. at 255 (emphasis added). See
also Alcoa S.S. Co. v. M/V Nordic Regent, 654 F.2d 147, 159 (2d
Cir. 1978) (en banc) ("It is abundantly clear . . . that the

                              36

Case 1:06-cv-00198-RMU    Document 4-7    Filed 02/13/2006    Page 37 of 46

JUN. 3. 2004  6:00PM                                                    NO. 6147   P. 38

prospect of a lesser recovery does not justify refusing to
dismiss on the ground of forum non conveniens."); Varnelo v.
Eastwind Transport Ltd., No. 02 Civ. 2084 (KMW), 2003 WL 230741,
at *17 (S.D.N.Y. Feb. 3, 2003).

Because defendants are subject to the jurisdiction of the
French courts and those courts will hear plaintiffs' claims,
defendants have shown that France is an adequate alternative
forum.

B.    Public Interest Factors

The Gilbert public interest factors include (1) the
administrative difficulties arising from congested courts; (2)
the imposition of jury duty on members of a community unconnected
to the litigation; (3) a forum's interest in adjudicating local
controversies; and (4) the potential difficulties arising from
the application of foreign law.  See Gilbert, 330 U.S. at 508-09.

The second and third factors weigh heavily in favor of
France.  It is important to remember that the Amores booked their
tickets in France, on a train owned and operated by SNCF, the
state-owned railway of France.  The complaint alleges tortious
conduct on the part of Accor and CIWLT that occurred wholly in
France.  The complaint alleges wrongdoing by corporations that
provide rail services in France and other parts of Europe jointly
with SNCF.  France has an extremely strong interest in ensuring

37

JUN. 3. 2004  6:01PM                                    NO. 6147    P. 39

that its own trains operate safely and that its partners and affiliates properly maintain and equip their trains and train their employees. France's active interest in these matters is evident both from the criminal investigation into the accident that is pending in Nancy, France, and from France's participation in COTIF, which provides for the uniform regulation of train litigation in signatory countries. Unlike Wiwa, this is not a case in which the interests of the American and alternative forum are in equipoise. See Wiwa, 226 F.3d 88, 97. Nor have plaintiffs alleged that the United States has a specific interest in the litigation of this suit in an American court, such as the enforcement of U.S. laws, see, e.g. DiRienzo v. Philip Services Corp., 294 F.3d 21, 32-33 (2d Cir. 2002), or the adjudication of an accident involving a large number of American citizens, see, e.g., Ski Train Fire at Kaprun, 230 F. Supp. 2d at 391 (noting that the accident in question occurred during a vacation marketed to members of the U.S. military and their families). The United States' general interest in protecting its citizens from harm while they travel abroad is tenuous in comparison to France's concrete, immediate interest in safe train travel within its borders.

Furthermore, to ask residents of the Southern District of New York to hear what would clearly be a lengthy and complex trial, involving Connecticut residents harmed by activities that

38

JUN. 3. 2004  6:01PM                                     NO. 6147   P. 40

occurred entirely in Europe, would be a significant burden.

The first and fourth factors add little weight to the analysis. As plaintiffs point out, the Second Circuit has concluded that the first factor has little or no applicability in this district because of the recent filling of judicial vacancies. *See* *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 n.5 (2d Cir. 2000). Likewise, while it is likely that French law applies to this dispute, defendants have not indicated any particular conflicts or difficulties likely to arise from the application of foreign law. *Cf.* *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981) ("[W]e must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform.").

Because France's interest in this lawsuit is so strong, and because the imposition of jury duty on residents of the Southern District would be a significant burden, the *Gilbert* public interest factors weigh heavily in favor of France as the appropriate site for this litigation.

C.    *Private Interest Factors*

*Gilbert's* private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of

39

premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508. Within the last factor, courts frequently consider the financial hardship that each party would experience as a result of litigation in a distant forum. *See, e.g., Wiwa*, 226 F.3d at 107.

Weighing heavily in favor of litigation in France is the fact that plaintiffs are unable to proceed against the Deutsche Bahn defendants in this court, and Accor and CIWLT will be unable to implead these parties. "The inability to implead other parties directly involved in the controversy is a factor which weighs against the retention of jurisdiction in the Southern District of New York." *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir. 1975); *see also Piper*, 454 U.S. at 267-68. To require the Accor defendants to litigate here seems an especially perverse result given that, according to the allegations of the complaint, the unavailable parties are the ones more directly responsible for the accident. Accor and CIWLT are being sued because their employees, working in cars adjacent to Railcar 120, failed to timely warn and evacuate the Amores after defendant Volker fled. It would be unfair, and a significant burden, to require Accor and CIWLT to litigate here without the opportunity to implead equally or more culpable parties. Accor and CIWLT will also have difficulty impleading SNCF, which would have a

40

strong defense of sovereign immunity in this forum. See Abrams v. Société Nationale des Chemins de Fer Français, 332 F.3d 173, 179-80 (2d Cir. 2003). By contrast, all of these parties are subject to the jurisdiction of the French courts.

It is also worth noting that bifurcating the suit, permitting plaintiffs to litigate against some of the defendants in New York, and requiring them to seek relief against others in Europe, would be as inconvenient for plaintiffs as for defendants. Litigation in France would therefore be more convenient for all parties.

The location of the evidence in this case also weighs in favor of France as the appropriate forum. Plaintiffs' arguments with respect to the location of evidence and witnesses depend heavily on their contention that the French court conducting a criminal investigation into the accident will soon rule on the culpability of the defendants, and defendants will be collaterally estopped from contesting liability in this action. Accordingly, plaintiffs argue that this court should undertake the forum non conveniens analysis as though this were a damages-only case, excluding from consideration access to evidence and witnesses that are relevant only to liability. But plaintiffs have presented no records from the French proceedings or affidavits from parties involved that demonstrate that Accor and CIWLT are involved in the French investigation or that the

41

JUN. 3. 2004  6:01PM

NO. 6147   P. 43

investigation is as wide-ranging in its examination of wrongdoing
as the complaint.  For these reasons, the res judicata effect of
any French ruling is not certain, and it would be inappropriate
to foreclose consideration of issues of convenience related to
liability.

Looking at the full range of proof likely to be introduced
in this case, what is most striking is that not a single fact
witness or piece of documentary evidence relevant to the
complaint's allegations of tortious conduct is located in the
United States.  Instead, all of the documents, witnesses, and
physical evidence that defendants will require to defend this
action are located in France, Belgium, or Germany.  The breadth
of plaintiffs' complaint, which sounds in negligence, product
liability, and breach of warranty, and seeks punitive as well as
compensatory damages, ensures that the factual evidence presented
in this case will be extensive.  Plaintiffs respond by pointing
out that their damages evidence is located in the United States,
which should cancel out any weight to be accorded to the location
of defendants' evidence.  But plaintiffs allude to this evidence
in conclusory terms, and do not explain what it consists of or
how it approaches in magnitude the evidence that defendants
promise to present.[1]  To the extent that it consists of expert

_____

[1] Furthermore, plaintiffs appear to be focusing on damages
relevant to their wrongful death claims.  By contrast, evidence
of decedents' conscious pain and suffering is located in France,

42 .

JUN. 3. 2004  6:01PM                                              NO. 6147   P. 44

testimony, it is entitled to little weight in the forum non
conveniens analysis.  See Brown v. Dow Corning Corp., No. 93 Civ.
5510 (AGS), 1996 WL 257614, at *2 (S.D.N.Y. May 15, 1996).

   Plaintiffs also argue that defendants are large corporations
that can afford the expense of transferring all of their evidence
to a foreign tribunal.  While courts do appear to be less
sympathetic to defendants' claims that litigation in a distant
forum will be prohibitively expensive when those defendants are
corporations with "vast resources," Wiwa, 226 F.3d 88 at 107,
defendants' financial resources cannot be a determinative factor
in the forum non conveniens analysis.  "If central emphasis were
placed on any one factor, the forum non conveniens doctrine would
lose much of the very flexibility that makes it so valuable."
Piper, 454 U.S. at 249-50.  The fact that defendants are
corporations does not automatically mean that they should bear
the significant costs of transporting every document, every piece
of physical evidence (which would likely include the train car in
question), and every witness relevant to the factual issues in
dispute in this case.  See Capital Currency Exchange, N.V. v.
Nat'l Westminster Bank PLC, 155 F.3d 603, 611 (2d Cir. 1998)
(affirming district court's dismissal on forum non conveniens
grounds where most of the witnesses resided in England and most

---

particularly in materials generated in the French criminal
investigation.

                              43

JUN. 3. 2004  6:02PM                                    NO. 6147  P. 45

of the documentary evidence was created and stored in England).

A related factor weighing in favor of litigation in France is defendants' inability to compel critical third-party witnesses to testify in New York and to compel the production of documents from third parties. For example, the individual most directly responsible for plaintiffs' injuries, Volker, cannot be compelled to appear here. Plaintiffs argue that defendants have recourse under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. § 1781 note, to compel depositions and document production in foreign countries. However, the evidence defendants would be required to seek through the assistance of foreign courts would be both extensive and critical, coming from the other alleged wrongdoers as well as from the French government's investigation into the accident. The process of obtaining this evidence would be costly and time-consuming. The massive inefficiency and inconvenience that this would create for defendants and plaintiffs is all the more striking given the existence of an alternative forum where many of these problems would not arise.

Against these factors must be weighed the inconvenience to plaintiffs of litigation in France. Plaintiffs argue that because France does not permit contingent fee arrangements, they cannot afford to litigate their case in France. However, the availability of contingent fee arrangements is only one factor to

44

be considered when analyzing the hardships to a plaintiff of
conducting litigation in a foreign forum. See Murray v. British
Broadcasting Corp., 81 F.3d 287, 292 (2d Cir. 1996). Plaintiffs
have offered no affidavits or other support for the proposition
that they are financially unable to conduct the lawsuit in
France. See, e.g., Ski Train Fire at Kaprun, 230 F. Supp. 2d at
389 (noting that the plaintiffs had filed affidavits
demonstrating the financial hardship they would experience if
forced to litigate abroad). The mere fact that they are
individual, not corporate, litigants does not mean that
litigation elsewhere is necessarily a hardship sufficiently
arduous to outweigh the other factors in the Gilbert analysis.

The Gilbert analysis reveals that this litigation has only a
tenuous connection to the United States, let alone to New York.
Plaintiffs are American citizens, as were the individuals whose
deaths gave rise to this suit. France has a significant interest
in ensuring the safety of its railways. Defendants would be
burdened by their inability to implead other culpable parties as
well as by the cost and difficulty of obtaining necessary
evidence and transporting it to this district. These problems,
as well as the fact that litigation here would be inefficient
because of this court's lack of jurisdiction over the Deutsche
Bahn defendants, indicates that this action should be dismissed
on forum non conveniens grounds in favor of litigation in France.

45

JUN. 3. 2004  6:02PM                                                    NO. 6147   P. 47

Accordingly, it is unnecessary to reach the Accor defendants' argument that the complaint fails to state a claim against them.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted.

SO ORDERED.

Dated:     New York, New York
           June 3, 2004

           *Miriam Goldman Cederbaum*

               Miriam Goldman Cederbaum
               United States District Judge

46